# 18-1697

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
Docket No. 18-1697

---

UNITED STATES OF AMERICA,
*Appellee,*

v.

CALVIN WEAVER,
*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

---

## PETITION FOR REHEARING *EN BANC*
## FOR APPELLEE UNITED STATES OF AMERICA

---

ANTOINETTE T. BACON
*Acting United States Attorney*
  *for the Northern District of New York*
100 South Clinton Street
Syracuse, NY  13261-7198
Tele: 315-448-0672
Email:  Carina.Schoenberger@usdoj.gov

CARINA H. SCHOENBERGER
*Assistant United States Attorney*
    *of Counsel*

# TABLE OF CONTENTS

PAGE

INTRODUCTION ..............................................................1

BACKGROUND ..............................................................2

    A.  Procedural History.................................................2

    B.  The Frisk .............................................................3

    C.  Panel Opinions.....................................................5

        1. Majority ........................................................5

        2. Concurrence...................................................7

        3. Dissent.........................................................8

ARGUMENT ...............................................................11

POINT I:
The Majority Opinion Incorrectly Conflates Search and Seizure Law in Holding That a Verbal Command Was a Frisk............................................................12

POINT II:
Considering an Officer's Subjective Intent to Determine Whether a Frisk Occurs Conflicts with *Whren*........................15

POINT III:
The Majority Opinion Raises the Standard for Reasonable Suspicion Established in *Terry*. ...............................17

CONCLUSION ...............................................................20

# TABLE OF AUTHORITIES

CASES:

*Arizona v. Johnson*,
　555 U.S. 323 (2009) ........................................................................ 14

*Bond v. United States*,
　529 U.S. 334 (2000) .............................................................. 10, 15

*Carpenter v. United States*,
　138 S. Ct. 2206 (2018) ................................................................ 12

*Dancy v. McGinley*,
　843 F.3d 93 (2d Cir. 2016) ........................................................ 13

*Doornbos v. City of Chicago*,
　868 F.3d 572 (7th Cir. 2017) .................................................... 13

*Illinois v. Wardlow*,
　528 U.S. 119 (2000) ...................................................................... 9

*Maryland v. Wilson*,
　519 U.S. 408 (1997) .................................................................... 15

*Terry v. Ohio*,
　392 U.S. 1 (1968) .............................................................. passim

*United States v. Padilla*,
　548 F.3d 179 (2d Cir. 2008) ................................................ 18, 19

*United States v. Santillan*,
　902 F.3d 49 (2d Cir. 2018) ........................................................ 17

*United States v. Tinnie*,
　629 F.3d 749 (7th Cir. 2011) .................................................... 13

*United States v. Weaver*,
　975 F.3d 94 (2d Cir. 2020) ................................................ passim

*Whren v. United States*,
  517 U.S. 806 (1996) ............................................................. passim

FEDERAL STATUTES, RULES AND OTHER AUTHORITIES:

18 U.S.C. § 922(g)(1) ...........................................................2

18 U.S.C. § 922(k) ...............................................................2

21 U.S.C. § 844(a) ...............................................................2

42 U.S.C. § 1983 .................................................................13

Fed. R. App. P. 35(b)(1)(A) ................................................2

Fed. R. Crim. P. 11(a)(2) .....................................................2

STATE STATUTES, RULES AND OTHER AUTHORITIES:

N.Y. Veh. & Traf. Law § 1163(b) ........................................3

# United States Court of Appeals

## FOR THE SECOND CIRCUIT
Docket No. 18-1697

---

UNITED STATES OF AMERICA,
*Appellee,*

v.

CALVIN WEAVER,
*Defendant-Appellant.*

---

## PETITION FOR REHEARING *EN BANC*
## FOR THE UNITED STATES OF AMERICA

---

## INTRODUCTION

The government, with the Solicitor General's authorization, petitions for rehearing *en banc* because the panel decision in this case announces rules that conflict with the Supreme Court's decisions in *Terry v. Ohio*, 392 U.S. 1 (1968), and *Whren v. United States*, 517 U.S. 806 (1996). Specifically, the split-panel decision (Pooler, J., joined by Calabresi, S.J.; Livingston, Ch.J., dissenting) holds that:

(1) during a lawful traffic stop, a police officer's verbal command to a suspect to place his hands on the car and separate his feet was a frisk;

(2) a police officer's subjective intent is relevant to determining whether he has conducted a frisk; and

(3) a police officer cannot lawfully conduct a frisk based on reasonable suspicion that a suspect is armed and dangerous where it is equally likely that the suspect is concealing a weapon as concealing other contraband.

Consideration by the full Court is necessary to secure and maintain uniformity of the Court's decisions. Fed. R. App. P. 35(b)(1)(A).

## BACKGROUND

### A. Procedural History

Defendant-Appellant Calvin Weaver entered a conditional guilty plea under Fed. R. Crim. P. 11(a)(2) to possessing a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1); possessing a firearm with a removed serial number, in violation of 18 U.S.C. § 922(k); and possessing a controlled substance, in violation of 21 U.S.C. § 844(a), reserving his right to challenge the district court's denial of his motion to suppress evidence derived from a traffic stop, during which police officers frisked Weaver and found a loaded semiautomatic handgun and powder cocaine. Weaver received a total prison term of 87 months and appealed. A divided panel of this Court reversed and remanded. *United States v. Weaver*, 975 F.3d 94, 97 (2d Cir. 2020).

2

## B. The Frisk

Police frisked Weaver around 5:00 p.m. on February 15, 2016, in a high-crime area of Syracuse, New York. *Weaver*, 975 F.3d at 97. As described by the majority opinion, three Syracuse Police Department officers initially saw Weaver while they patrolled in an unmarked car. *Id.* Weaver stared at the officers' car as it drove by and adjusted his waistband before getting into a gray sedan. *Id.* The officers saw the sedan stop at a stop sign, and only then activate its turn signal, in violation of N.Y. Veh. & Traf. Law § 1163(b), requiring that all vehicles signal 100 feet before a turn. *Id.* Using the unmarked car's emergency lights, the officers pulled the sedan over. *Id.* When the sedan stopped, a traffic-side rear door opened quickly, leading the officers to believe that a passenger was about to flee. *Id.* The rear passenger followed an officer's instruction to stay in the vehicle. *Id.* Another officer, now-Detective Jason Tom, recognized Weaver from earlier, and saw him squirming in the front passenger seat, appearing to push something down into his pelvic area. *Id.* In a pre-suppression-hearing affidavit, Tom stated, "[b]ecause I observed Weaver moving his hands around his waist and pelvis while shifting his hips, I believed he may have been in

3

possession of a weapon." Appendix, Dkt. 18 ("A") 60. When Tom asked Weaver to show his hands, Weaver complied, saying, "I don't got nothin'." *Weaver*, 975 F.3d at 97. Weaver provided identification and put his hands on his head. *Id.* at 97-98. Seeing no bulges in Weaver's pockets, Tom ordered Weaver to exit the car and place his hands on the trunk with his feet apart. *Id.* Weaver complied, but put his pelvis against the car, so Tom asked him to step back. *Id.* at 98; A:37, 61, 66. Weaver claimed that he could not because "it was slippery," but Tom saw nothing slippery on the ground. *Id.*; A:163.[1] Weaver took a small step back. *Weaver*, 975 F.3d at 98. Tom then patted Weaver's waist area, and Weaver "immediately" put his pelvis against the car and "again…said it was slippery." *Id.* (quoting A:163). Tom pulled Weaver back, and when he restarted the patdown, Weaver "again thrust his pelvic area" against the car. *Id.* (quoting A:164). Tom placed Weaver in handcuffs and completed the frisk, which revealed a loaded firearm concealed in Weaver's long underpants. *Id.*

---

[1] At the suppression hearing, Officer Tom explained that Weaver made his claim about the slippery ground both before and after Tom began patting his clothing, A:163, which is consistent with Tom's police report, pre-hearing affidavit, and earlier testimony, A:37, 61, 66.

## C. Panel Opinions

### 1. Majority

Judge Pooler wrote for the two-judge majority, holding that Officer Tom lacked reasonable suspicion that Weaver was armed and dangerous, and reversing the district court's suppression decision. *Id.*

In reaching its holding, the majority first determined that the frisk began, not when Tom touched Weaver's clothing to initiate the patdown, but at least by the time that Tom "instructed [Weaver] to place his hands on the trunk with legs spread apart (what may be referred to as an 'in search' position)." *Id.* at 100-01. The majority reasoned that when Tom "instructed Weaver to exit the car and assume a position" a "reasonable person could only have interpreted [that] to mean that the search had begun." *Id.* at 101. The majority likened this to assessing whether a seizure occurred based on whether a reasonable person would feel free to leave, and stated that "it makes little sense, on the one hand, to agree that a seizure for Fourth Amendment purposes may occur before physical force is used, but on the other hand, to maintain that a search only occurs after." *Id.* at 101 & n.3. The majority distinguished Weaver's scenario from the well-settled constitutionality of requiring a passenger to leave a

5

car during a lawful traffic stop by reasoning, without citation, that such an order "might be a de minimis intrusion on the passenger's liberty," but "ordering someone to spread-eagle on a car is manifestly not. It is a search!" *Id.* at 101.

The majority assessed whether reasonable suspicion existed at the point that Tom ordered Weaver out of the car, because, when Tom gave his order he had subjectively "decided to frisk Weaver" and instructed him to assume an "in search" position. *Id.* Accordingly, the majority disregarded the evidence that Weaver pressed his pelvis against the car and gave a false explanation for doing so, limiting its reasonable suspicion analysis to: "(1) Weaver's staring at the unmarked police car as it drove by; (2) Weaver's adjustment of his waistband while walking; (3) Weaver's statement that he had nothing on him; and (4) Weaver's pushing down his pants and wiggling back and forth while in the passenger seat." *Id.* at 102-03. Calling the fourth fact "[t]he Government's strongest," the majority nevertheless concluded that Weaver's movements did not establish reasonable suspicion that he was armed and dangerous because "Weaver's actions were equally consistent with the act of secreting drugs or other nonhazardous contraband," and

"we cannot say that an objectively reasonable officer who witnessed such an action would conclude that Weaver carried a firearm." *Id.* at 103. The majority rejected what it described as the dissent view that "any conduct consistent with, or possibly suggestive of, weapon possession satisfies the reasonable-suspicion standard." *Id.* at 106. The majority refused to give weight to the uncontested fact that the traffic stop occurred in a high-crime neighborhood, calling this factor "so meritless" as to "warrant little discussion." *Id.* at 105. The majority also omitted from its analysis the officers' observation of a door opening as if a passenger was about to flee, saying that the "record is bereft of any indication as to why the rear passenger opened the door, and we therefore cannot say what his intentions were." *Id.* at 105 & n.10.

### 2. Concurrence

Judge Calabresi wrote separately "to express [his] concern with the state of the law in this area," noting that the "current approach" has led to "current protests," and conceding that "my learned and respected colleague in dissent does not stretch the law all that much in arguing that the evidence the officers found should be admitted." *Id.* at 107, 110.

7

### 3. Dissent

In dissent, Chief Judge Livingston described three central conflicts between existing Fourth Amendment law and the majority opinion.

First, the dissent explained that the majority's conclusion that reasonable suspicion cannot be founded on conduct that is equally consistent with hiding a weapon as hiding something else illicit "is wholly inconsistent with the Supreme Court's repeated admonitions that the Fourth Amendment's touchstone is reasonableness" and "that the determination of reasonable suspicion, premised on commonsense judgments and inferences about human behavior, requires considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Id.* at 111 (quotation marks and citations omitted). The dissent explained that the majority's opinion raises the standard established in *Terry* that a police officer may conduct a frisk when the "officer observes unusual conduct which leads him reasonably to conclude in light of his experience…that the persons with whom he is dealing *may* be armed and presently dangerous," *id.* at 112 (quoting 392 U.S. at 30) (dissent's emphasis), even when the unusual conduct is "ambiguous and susceptible of an innocent explanation," *id.* at

8

111 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)), to one where an officer must *know* that an individual is armed and dangerous before conducting a frisk, *id.* at 111. The dissent described this rule shift as "startling and untenable." *Id.*

Second, the dissent found "the majority's conclusion that a frisk commences when an officer (supposedly) decides to perform a frisk and orders a suspect to assume what the majority terms an 'in search' position…both erroneous and problematic." *Id.* at 113. The dissent explained that the majority's approach conflicts with *Terry* "which defines a frisk as 'a limited search of the outer clothing for weapons,' not as a directive to put one's hands on the hood of a car." *Id.* (quoting 392 U.S. at 24).

Third, the dissent explained that the majority's reliance on the officer's subjective intent as a factor in determining whether a frisk has begun runs afoul of the Supreme Court's "unwilling[ness] to entertain Fourth Amendment challenges based on the actual motivations of individual officers." *Id.* at 115 (quoting *Whren*, 517 U.S. at 813). The dissent stated, "because 'the issue is not his state of mind, but the objective effect of his actions,'" Tom's intention "when he asked Weaver to position himself at

9

the back of the car…is not relevant" and his "verbal directive did not constitute a frisk." *Id.* at 115 (quoting *Bond v. United States*, 529 U.S. 334, 338 n.2 (2000)).

The dissent maintained that a proper reasonable suspicion analysis would have included the following facts, considered in totality: Weaver's behavior in staring at an unmarked police car, adjusting his waistband, and volunteering, "I don't got nothing"; the sedan door opening into traffic; Weaver's movements suggesting that he was "trying to push something down"; and the high-crime setting at dusk. *Id.* at 112. On these facts, the dissent would have found that Tom had reasonable suspicion for a protective frisk even before ordering Weaver to leave the car. *Id.* at 113. However, given the dissent's disagreement with the majority about when the frisk began, the dissent also would consider the additional facts that Tom observed before patting Weaver's clothes, including Weaver pressing his pelvis against the car, taking only a "small step back" when asked to reposition, and making an unsupported claim that the ground was slippery. *Id.* & n.3. The dissent further noted that "[t]he possibility that Weaver might have been hiding drugs in his groin area does not negate Officer Tom's reasonable suspicion that he was in

10

fact hiding a gun," and disagreed with the "majority's suggestion that an officer must possess dispositive evidence of dangerousness in order to justify a stop and frisk." *Id.* at 119.

In summary, the dissent observed that the majority's attempt to express its disagreement with the *Whren* line of cases, allowing pretextual traffic stops, in the context of a *Terry*-stop case caused it to: "too quickly dismiss[ ] Officer Tom's reasonable safety concerns in light of Weaver's obviously suspicious conduct"; "adopt[ ] an unreasonable position that effectively requires that police officers take unnecessary risks in the performance of their duties"; and "misappl[y] basic Fourth Amendment law," ultimately serving "neither police, suspects, nor communities well." *Id.* at 119-20.

## ARGUMENT

The government seeks rehearing *en banc* because, as Chief Judge Livingston's dissent explains, the panel decision conflicts with Supreme Court precedent, disrupts well-known standards governing protective frisks, and increases risk to officers, participants, and bystanders during undisputedly lawful traffic stops.

11

**POINT I: The Majority Opinion Incorrectly Conflates Search and Seizure Law in Holding That a Verbal Command Was a Frisk.**

The majority's holding that "ordering someone to spread-eagle on a car…is a search," *Weaver*, 975 F.3d at 101, is novel and elides the distinction between a seizure (restraint or control of a suspect's movement) and a search (an attempt to discover something private).

Whereas seizures concern restraints on liberty, *Terry*, 392 U.S. at 19 n.16, Fourth Amendment search analyses relate to interests against physical trespass and privacy invasion, *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018). In *Terry*, the Supreme Court concluded that, during law enforcement encounters, safety considerations may override these interests, permitting a frisk, described as a "limited search of the outer clothing for weapons." 392 U.S. at 24, 29. The Supreme Court explained that this type of "serious intrusion upon the sanctity of the person" is "a wholly different kind of intrusion" than an arrest, and "the interests each is designed to serve are likewise different." *Id.* at 17, 26. The *Terry* Court recognized the difference between a seizure, or "stop," and a search, or "frisk," noting that, in Terry's case, the frisk occurred upon the officer's "initiation of physical contact for purposes of

12

searching…for weapons," and declining to decide whether a seizure occurred before that point. *Id*. at 19 n.16.

Here, the majority opinion sidesteps the distinction between a seizure and a search as well as the underlying interests at stake. In equating Officer Tom's verbal command to Weaver with a search, the majority borrows its reasoning from the seizure context saying, "any reasonable person" would "interpret[ the command] to mean that the search had begun." *Weaver*, 975 F.3d at 101. The majority cites for support a seizure case, *id.* (citing *Dancy v. McGinley*, 843 F.3d 93, 108-09 (2d Cir. 2016)), and the dissenting opinion from a Seventh Circuit case where the majority concluded that the frisk at issue did not begin before the officer touched the defendant, but the dissenting judge argued that "[e]ssentially the same rule" for when a seizure begins "should apply to a frisk," *United States v. Tinnie*, 629 F.3d 749, 759 (7th Cir. 2011) (Hamilton, J. dissenting) (cited at *Weaver*, 975 F.3d at 101).[2] The

---

[2] The majority also cites *Doornbos v. City of Chicago*, 868 F.3d 572, 580-83 (7th Cir. 2017), concerning a civil matter brought under 42 U.S.C. § 1983, and whether a trial court erred in declining to give instructions on the legal standards for both stops and frisks where an officer reached for the plaintiff to frisk him. *Weaver*, 975 F.3d at 101. The majority cites

13

majority's reasoning is inapt. While Tom's order for Weaver to place his hands on the car and separate his feet restricted Weaver's movement, it created no physical intrusion and revealed no private information, so was not a search of any kind, much less an "exploration of the outer surfaces of a person's clothing…in an attempt to find weapons." *Terry*, 392 U.S. at 16. A person's belief that a search has begun, whether reasonable or not, has no bearing on whether an officer has committed trespass or invaded privacy, the questions relevant to reviewing a search under the Fourth Amendment. The majority's conflation departs from the well-established need to analyze Fourth Amendment seizures and searches separately. *See, e.g.*, *Arizona v. Johnson*, 555 U.S. 323, 326-27 (2009) (defining stop as "temporary detention" and frisk as "patdown for weapons" and noting that "to proceed *from a stop to a frisk*, the police officer must reasonably suspect that the person stopped is armed and dangerous") (emphasis added).

---

no decision construing as a frisk a police officer's verbal command to a suspect to assume a so-called "in search" position.

The majority's approach disrupts two bright-line rules—that an officer may order driver and passengers from a car during a lawful traffic stop, *Maryland v. Wilson*, 519 U.S. 408, 413 (1997), and that a frisk involves physical contact—leaving police officers and district courts without a means of distinguishing between verbal commands used to limit suspects' movements during lawful police encounters and those that signify the start of a search.

## POINT II: Considering an Officer's Subjective Intent to Determine Whether a Frisk Occurs Conflicts with *Whren.*

The majority's conclusion that Officer Tom's verbal directions to Weaver became a frisk because Tom gave them "solely in order to frisk Weaver," *Weaver*, 975 F.3d at 102, cannot be squared with the Supreme Court's admonition that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis," *Whren*, 517 U.S. at 813. "[T]he subjective intent of the law enforcement officer is irrelevant in determining whether that officer's actions violate the Fourth Amendment….[T]he issue is not [the officer's] state of mind, but the objective effect of his actions." *Bond*, 529 U.S. at 338 n.2. As the dissent points out, the cases that the majority cites—again seizure rather than

15

search decisions—do not support its position that Tom's subjective state of mind governs the determination of whether the frisk began when Weaver was told to leave the car and position himself on the trunk. *Weaver*, 975 F.3d at 115. The majority attempts to address this problem by explaining that *Whren* "means only that we must ignore intent in determining *why* the officer took the challenged action," but "does not preclude us from looking at intent in determining *when* the action was initiated." *Weaver*, 975 F.3d at 102 (original emphasis). This interpretation of *Whren*, which the majority offers without supporting authority, does not justify its analysis, which *is* premised on why Tom gave his orders to Weaver, namely with intent to frisk him. Moreover, the questions of when and whether a frisk occurred cannot logically be separated; when a frisk is initiated, it has occurred.

This feature of the majority's approach will only confuse *Terry* doctrine and leave police officers without clear guidance going into lawful roadside encounters. After the fact, in addition to having to decide whether an officer's commands to a suspect would cause a reasonable person to believe that a search had begun, district courts will have to determine whether and at what point the officer intended to frisk the suspect. The

16

Supreme Court has sensibly foreclosed such inquiry, avoiding the need to recreate an individual officer's subjective mental state in order to conduct a Fourth Amendment analysis.

## POINT III: The Majority Opinion Raises the Standard for Reasonable Suspicion Established in *Terry*.

The majority opinion creates a standard whereby a law enforcement officer may not conduct a protective frisk—even if it is reasonable to suspect that a person is concealing a weapon—where the concealed object is equally likely some other illicit item. In essence, this raises the *Terry* standard from reasonable suspicion to a preponderance of the evidence.

Controlling law shows that this is not the rule. *Terry* allows frisks of people who "*may* be armed and presently dangerous," 392 U.S. at 30 (emphasis added), and "[c]onduct that is as consistent with innocence as with guilt may provide the basis for reasonable suspicion," *United States v. Santillan*, 902 F.3d 49, 56 (2d Cir. 2018). Accordingly, as the dissent explained, "just as the reasonable suspicion standard does not require officers to rule out every *innocent* explanation for a suspect's conduct, they need not rule out every alternative *illicit* (yet non-dangerous) explanation for the conduct in which a suspect might be engaged to

17

conclude that he could pose a threat." *Weaver*, 975 F.3d at 118-19 (original emphasis).

In creating its new rule, the majority distinguishes *United States v. Padilla*, 548 F.3d 179 (2d Cir. 2008), where the Court considered the high-crime neighborhood, noticeably atypical conduct of the defendant and his companions, and the defendant's "apparent adjustment of a concealed firearm" in determining that the detaining officers had reasonable suspicion to stop and frisk the defendant. *Id.* at 189. The majority asserts that the suspicious movement in *Padilla* differed from Weaver's because in *Padilla*, the officer's testimony showed that the movement was "'consistent with the adjustment of a gun lodged in one's waistband' but not 'consistent with any innocent explanation.'" *Weaver*, 975 F.3d at 104 (citing *Padilla*, 548 F.3d at 183). This misreads the record both in *Padilla* and here. The officer in *Padilla* "realized at the time that Padilla could have been adjusting something other than a firearm." *Padilla*, 548 F.3d at 183. Although the officer "did not recognize the gesture as being consistent with any innocent explanation," he explained that people generally keep "illegal items" in their center waistbands, including, as he witnessed on one occasion, firecrackers. *Id.*

18

at 183 & n.2.  Illegal items are not necessarily dangerous items, and, in any event, the *Padilla* Court did not suggest that a possible innocent explanation for the defendant's movements would have negated reasonable suspicion.  Instead, it said, "[e]ven if the gesture were consistent with conceivable innocuous adjustments, its 'distinctive' consistency with the adjustment of a firearm provided the detective with a reasonable basis to suspect that Padilla was armed."  *Id.* at 189.  Moreover, to the extent that the majority distinguishes *Padilla* because the officer there described the defendant's movements as suggesting the presence of a gun, Officer Tom did the same in his pre-hearing affidavit, A:60, a fact omitted from the majority's description of this case.

Even though the majority concedes that there is "no doubt that Officer Tom reasonably suspected that Weaver was hiding something," it finds that Tom could not lawfully frisk Weaver because his suspicious movements were "equally consistent" with concealing drugs or nonhazardous contraband.  *Weaver*, 975 F.3d at 103.  Under this rule, an officer who reasonably suspects that a lawfully-detained suspect is concealing contraband would, even with a 50% belief that the concealed item is a dangerous weapon, have to forego a protective frisk or risk legal

19

exposure for a constitutional violation. In heightening the standard for conducting a frisk, the majority's new rule necessarily increases risk to all participants in lawful traffic stops.

***

The government appreciates, as the concurring opinion references, *Weaver*, 975 F.3d at 110, that this case arises during a period of national attention to questions surrounding policing and race. So too did *Terry* and *Whren*. *Terry*, 392 U.S. at 14-15; *Whren*, 517 U.S. at 813. Because the panel decision conflicts with standards that the Supreme Court established to balance safety interests and constitutional rights, the case should be considered by the full Court.

<h2 style="text-align:center">CONCLUSION</h2>

The Court should rehear the case *en banc*.

Dated: Syracuse, New York
      October 29, 2020

Respectfully submitted,

ANTOINETTE T. BACON
*Acting United States Attorney*
 *for the Northern District of New York*
*Attorney for Appellee*

s/ *Carina H. Schoenberger*
By:   CARINA H. SCHOENBERGER
*Assistant United States Attorney*

20

# ADDENDUM

975 F.3d 94
United States Court of
Appeals, Second Circuit.

UNITED STATES of America, Appellee,
v.
Calvin WEAVER, Defendant-Appellant.

Docket No. 18-1697
|
August Term, 2019
|
Argued: September 26, 2019
|
Decided: September 15, 2020

**Synopsis**
**Background:** Defendant filed pretrial motion to suppress evidence discovered during *Terry* weapons frisk. The United States District Court for the Northern District of New York, Glenn T. Suddaby, Chief Judge, denied motion, and defendant appealed.

**Holdings:** The Court of Appeals, Pooler, Circuit Judge, held that:

lawfulness of Terry weapons frisk had to be evaluated based on information in officer's position when, after ordering an occupant out of motor vehicle, officer instructed him to place his hands on the trunk with legs spread apart, and

while officer might have reason to suspect that suspect was hiding something in his pants, he had no reason to suspect that that something

was dangerous, as required to conduct Terry weapons frisk.

Reversed and remanded.

Calabresi, Senior Circuit Judge, filed concurring opinion fully joining the majority in its holding.

Livingston, Circuit Judge, filed dissenting opinion.

**Procedural Posture(s):** Appellate Review; Pre-Trial Hearing Motion.

**\*96** Appeal from the United States District Court for the Northern District of New York (Suddaby, *C.J.*)

**Attorneys and Law Firms**

JAMES P. EGAN, Assistant Federal Defender, for Lisa A. Peebles, Federal Public Defender for the Northern District of New York, Syracuse, NY, for Defendant-Appellant.

CARINA H. SCHOENBERGER, Assistant United States Attorney, for Grant C. Jaquith, United States Attorney for the Northern District of New York, Syracuse, NY, for Appellee.

Before: LIVINGSTON, Chief Judge, CALABRESI and POOLER, Circuit Judges.

**Opinion**

Judge Calabresi concurs in a separate opinion.

Chief Judge Livingston dissents in a separate opinion.

POOLER, Circuit Judge:

**\*\*1** Calvin Weaver appeals from the December 20, 2017 order of the United States District Court for the Northern District of New York (Suddaby, *C.J.*) denying his motion to suppress a firearm that police officers discovered in the course of a pat-down frisk of Weaver's person conducted during a traffic stop.

It is well established that the Fourth Amendment permits the police "a narrowly drawn authority" to conduct "a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Here, however, the police lacked an "articulable and objectively reasonable belief," *Michigan v. Long,* 463 U.S. 1032, 1051, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), that Weaver was "armed and presently dangerous to the officers or others," *Terry*, 392 U.S. at 24, 88 S.Ct. 1868. **\*97** At most, the officers had reason to believe that Weaver possessed something illicit. But the Constitution requires more: it requires the officers have reason to believe this something was dangerous. Accordingly, we REVERSE the district court's denial of Weaver's motion to suppress and REMAND for further proceedings consistent with this opinion.

## BACKGROUND

At approximately 5 p.m. on Monday, February 15, 2016, Officers Quonce, Tom, and Staub of the Syracuse Police Department ("SPD") observed Weaver walking along a street curb while they were driving in an unmarked police vehicle with tinted windows on the westside of Syracuse, a high-crime area. As the officers drove past, Weaver "stared into [their] vehicle, continued to stare, as [they] approached, as [they] passed, and continued to stare as [they] proceeded past him." App'x at 150-51. According to Officer Quonce, Weaver stared for "probably a few seconds but it seemed longer than typically one would look at a vehicle." App'x at 95.

The officers then saw Weaver walk towards a gray sedan and "adjust[ ] his waistband." App'x at 151. Officer Tom described this adjustment as "just a subtle tug of his waistband, like an upward tug motion," explaining that "his pants were lower than waist level and it was kind of a tugging upward like adjusting. ..." App'x at 152. Weaver sat down in the front passenger seat, and the car drove away.

The officers drove on but encountered the gray sedan again driving on Davis Street. After the car stopped at a stop sign at the intersection of Davis Street and Delaware Street, the driver turned on his right indicator light to signal a turn. This constituted a traffic infraction, as New York Vehicle and Traffic Law requires that all vehicles signal 100 feet *prior* to a turn. New York Veh. & Traf. Law § 1163(b). The gray sedan turned onto Delaware Street and then quickly turned onto South Geddes Street. The

officers followed the sedan onto South Geddes Street, turned on the police vehicle's emergency lights, and pulled the sedan over to the right side of the road.

When the gray sedan stopped, the officers observed that the rear passenger's driver's side door quickly opened up into traffic. The officers "believed that the rear passenger was about to flee from the vehicle." App'x at 103. When Officer Quonce instructed that party to stay in the vehicle, however, the rear passenger closed his door and remained in the car. That passenger also complied with police orders directing him to hold his arms in front of him and to put his hands on his head.

**\*\*2** Officer Tom observed Weaver sitting in the front passenger seat. As Officer Tom approached the gray sedan, he testified that "from my vantage point I can see into the cabin of the vehicle clearly, I see the front passenger with both hands kind of pushing down on his pelvic area and squirming kinda in the seat left and right, shifting his hips." App'x at 158. Officer Tom stated that Weaver used two hands to make a "[d]ownward motion, trying to push something down." App'x at 159.

Officer Tom asked Weaver to show him his hands, and Weaver complied. Weaver also told Officer Tom, "I don't got nothin'." App'x at 159. Officer Tom instructed Weaver to put his hands on his head, and he again complied. Officer Tom then asked Weaver if he possessed identification and "visually inspected his right pocket." App'x at 160. Concluding that "it didn't appear that there was any bulges in his pocket," Officer Tom asked Weaver "to slowly use his right hand to remove his ID from his

pocket." App'x at 160. Weaver complied **\*98** and handed Officer Tom a New York State benefit card.

Officer Tom ordered Weaver to step out of the car and place his hands on the trunk with his legs spread apart. Weaver also complied with this order. Officer Tom testified that Weaver "was very close to the rear quarter panel of the vehicle," so he "asked him to take a step back." App'x at 162. Weaver "took a small step back, and then [Officer Tom] began to pat his waistband area." App'x at 162. When Officer Tom patted Weaver's waist area, Weaver "immediately stepped forward and pressed his pelvic area against the quarter panel of the vehicle." App'x at 162. This prevented Officer Tom "from doing an effective pat frisk of [Weaver's] waist area," so he asked Weaver "to take a step back and he did but again he said it was slippery." App'x at 163. Officer Tom then pulled Weaver "the distance where [Officer Tom] wanted him to be at so [he could] effectively do a pat frisk," and Weaver "took a step back, his hands remain[ing] on the rear of the vehicle." App'x at 164. As Officer Tom began to pat frisk Weaver a third time, Weaver "again thrust his pelvic area against the rear quarter panel of the vehicle." App'x at 164. Officer Tom then placed Weaver in handcuffs, pulled him away from the vehicle, and conducted a pat frisk of his waist and front pockets.

Officer Tom felt nothing suspicious at Weaver's waist, but he felt a "slight small bulge" in Weaver's front pocket. App'x at 165. Believing this bulge to be a narcotic, Officer Tom reached into Weaver's pocket and pulled out a white powdery substance that field tested as cocaine.

Officer Tom continued the pat frisk, from Weaver's right leg from the top down, and then back up his right leg before transitioning to the groin area, left leg upper groin area, and left leg. At that point, Officer Tom "felt something hard," which he believed was a barrel of a firearm. App'x at 166-67.

Officers Tom and Quonce placed the driver and remaining passenger in handcuffs while Detective Staub secured Weaver. Detective Staub then motioned Officer Quonce towards the front groin area of the pants Weaver had on. When Officer Quonce conducted a pat-down frisk of the outside of Weaver's clothing of that area, he felt the barrel and handle of a gun through Weaver's pants. Officer Quonce unzipped Weaver's pants and saw that Weaver had "long john underwear on underneath [his pants] with ... a button on the fly," so Officer Quonce "unbuttoned the fly and ... removed the handgun." App'x at 110. The officers found live ammunition in the handgun's magazine.

**3 On August 31, 2017, Weaver was charged with one count of being a felon in possession of a firearm in violation of 🚩 18 U.S.C. § 922(g)(1), one count of possession of a firearm with a removed serial number in violation of 🚩 18 U.S.C. § 922(k), and one count of simple possession of a controlled substance in violation of 🔖 21 U.S.C. § 844(a). [1] Weaver moved to suppress the firearm as the fruit of an unconstitutional search, arguing that the police lacked reasonable suspicion to conduct a pat-down frisk of his person during the traffic stop.

[1] Weaver was initially charged in state court with criminal possession of

a weapon in the second degree in violation of 🔖 New York Penal Law § 265.03(3). On June 29, 2016, Onondaga County Court issued an order suppressing the firearm evidence on grounds that the SPD lacked reasonable suspicion to conduct a pat-down search of Weaver's person, and therefore, the search violated the Fourth Amendment.

The district court denied Weaver's motion to suppress after a hearing. The district court held in relevant part that the officers had reasonable suspicion to conduct a pat-down frisk based on Weaver's *99 actions in (1) watching the police vehicle as it drove past him; (2) pulling up on the waistband of his pants while walking; (3) slouching down in his seat, pushing in a downward motion on his pelvic area with both hands, and squirming or shifting his hips left to right; (4) telling Officer Tom that he "don't got nothing"; and (5) trying to prevent the officers from frisking his waist area, though it held that reasonable suspicion was present even absent this last fact. The court also considered that the search occurred in a high-crime area and another passenger in the car had swung his door open immediately when the police stopped the car.

Weaver subsequently entered a guilty plea to the three charges pursuant to a conditional plea agreement that allowed him to appeal the district court's denial of suppression. App'x at 232. Weaver was sentenced principally to 87 months' imprisonment and three years' supervised release.

Weaver timely appealed.

## DISCUSSION

"On review of a challenged suppression order, we examine the district court's findings of fact for clear error, reviewing *de novo* questions of law and mixed questions of law and fact, including the existence of reasonable suspicion to stop or extend a stop." *United States v. Santillan*, 902 F.3d 49, 56 (2d Cir. 2018). We look at the totality of the circumstances from the view of a reasonable and cautious officer on the scene. *Id.*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Generally, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (footnote omitted).

In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court recognized one such exception when it held that police officers can stop someone whom they reasonably suspect is involved in the commission of a crime and conduct a protective search of this person for weapons, even absent a warrant or probable cause for an arrest. Critically, this does not provide the police with a free pass to search for *anything* illicit. The Court's central preoccupation was the need to protect officers from dangerous weapons, and its holding was tailored accordingly: "When

an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is *armed and presently dangerous* to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a *weapon* and to neutralize the *threat of physical harm*." *Id.* at 24, 88 S.Ct. 1868 (emphasis added).

**\*\*4** To establish that an officer is justified in neutralizing such a threat, the "police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. 1868. We apply "an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?" *Id.* at 21-22, 88 S.Ct. 1868 (internal quotation marks and citation omitted). While we have explained that "the concept of reasonable **\*100** suspicion is not susceptible to precise definition, ... some minimal level of objective justification is required," not just "inchoate suspicion or mere hunch." *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000) (internal quotation marks and citations omitted).

*Terry* has since been extended to a number of contexts, including that of protective searches in the specific factual circumstance at issue here: an investigative stop of an automobile. In *Pennsylvania v. Mimms*, 434 U.S. 106, 112, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), the Supreme Court held that police officers can

conduct an investigative stop of an automobile and frisk the driver of the car for weapons, reiterating the *Terry* requirement that the officers have an objectively reasonable and articulable belief that the driver is armed and dangerous. Similarly, in *Michigan v. Long*, 463 U.S. 1032, 1051, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), the Court allowed the police "to conduct an area search of the passenger compartment to uncover weapons, as long as they possess an articulable and objectively reasonable belief that the suspect is potentially dangerous." In line with its previous admonitions, the Court explicitly warned that police officers cannot conduct searches "*whenever* they conduct an investigative stop" of an automobile, because "[a] *Terry* search, unlike a search without a warrant incident to a lawful arrest, is not justified by any need to prevent the disappearance or destruction of evidence of crime. ... The sole justification of the search ... is the protection of police officers and others nearby." *Id.* at 1049 n.14, 103 S.Ct. 3469 (internal quotation marks and citation omitted). Subsequent Supreme Court cases extended the rule in *Terry* and *Mimms* to automobile passengers. *See Maryland v. Wilson*, 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997) (holding that police officers can order automobile passengers out of the vehicle during traffic stops); *see also Arizona v. Johnson*, 555 U.S. 323, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009).

*Terry* makes clear that reasonable suspicion must be present at the "inception" of the officer's search. 392 U.S. at 20, 88 S.Ct. 1868. Thus, our analysis of whether reasonable suspicion was present considers only the facts known to the officer that prompted him to search or seize. *See Dancy v. McGinley*, 843 F.3d 93, 108-09 (2d Cir. 2016); *United States v. Freeman*, 735 F.3d 92, 96-97 (2d Cir. 2013).

The central dispute in this case is whether the SPD had an objectively reasonable belief that Weaver was "armed and presently dangerous to the officers or to others." *Long*, 463 U.S. at 1047, 103 S.Ct. 3469 (internal quotation marks omitted). It did not. None of the facts before us—individually or collectively—is sufficient to establish that the SPD officers had an objectively reasonable suspicion that Weaver was armed and dangerous. [2]

[2] The dissent argues that the majority improperly considers facts piecemeal. With respect, that is simply not true. That we discuss the considerations independently does not mean that we assess each in isolation or fail to evaluate the facts cumulatively. We take a moment to repeat, as we do throughout this opinion, that whether analyzed singly or jointly, the circumstances before the SPD do not support an objectively reasonable suspicion that Weaver was armed and dangerous. Even when the facts and reasonable inferences drawn therefrom are stacked, they provide an insufficient basis for an objective, even cautious, officer to find reasonable suspicion that Weaver was armed or dangerous for the reasons we discuss in section II, *infra*.

## I. The Inception of the Frisk

**\*\*5** As an initial matter, we consider only the events that occurred *before* **\*101** Officer Tom ordered Weaver to put his hands on the trunk of the car. It is clear that Officer Tom had effectively initiated a search of Weaver when he instructed him to place his hands on the trunk with legs spread apart (what may be referred to as an "in search" position), because there is no other reason in our view to ask Weaver to assume this position. A frisk is a search. And a search, like a seizure, may begin before there is any physical contact, at the time when "a reasonable person would have believed that the search was being initiated." *Doornbos v. City of Chicago*, 868 F.3d 572, 581 (7th Cir. 2017); *see also Dancy*, 843 F.3d at 108–09 (noting that because " a stop must be justified 'at its inception,' we consider only the facts known to [the officer] that prompted him to give [the order]" that would have caused a reasonable person in the suspect's position to believe "that he was not free to leave" (internal quotation marks and citation omitted)). [3] Actually touching a suspect "with the intention of frisking him," of course, constitutes a search. *Dancy*, 843 F.3d at 108 n.12. But in this case, by the time Officer Tom touched Weaver, he had already instructed Weaver to exit the car and assume a position that any reasonable person could only have interpreted to mean that the search had begun. Objectively, the search was therefore initiated after Officer Tom ordered Weaver out of the car, but no later than the moment when Officer Tom directed Weaver to assume this "in search" position. It is at that point that Officer Tom must have had an articulable and objectively reasonable belief that Weaver had something dangerous.

[3] The dissent states that our Court's decision in *Dancy* is inapposite because our analysis focused on when an investigatory stop, not a search, occurred. *Dancy*, 843 F.3d at 108. But it makes little sense, on the one hand, to agree that a seizure for Fourth Amendment purposes may occur before physical force is used, but on the other hand, to maintain that a search only occurs after.

The dissent argues that the majority's analysis is "both erroneous and problematic" as it focuses only on conduct occurring before Officer Tom decided to frisk Weaver. It provides two reasons for this assessment, neither of which is appropriately explanatory.

First, the dissent notes, correctly, that an order to exit a vehicle during a lawful stop amounts only to a de minimis intrusion on Weaver's liberty. It then accuses the majority of elevating this intrusion into something more. The dissent reaches this conclusion by focusing largely on the order that Weaver get out of the car and minimizing the order that he place his hands on the car and spread his feet apart. But when Weaver exited the vehicle, Officer Tom directed him to assume a position that indicated to Weaver that Officer Tom was about to frisk him. And while asking a passenger to exit a vehicle might be a de minimis intrusion on the passenger's liberty, ordering someone to spread-eagle on a car is manifestly not. It is a search!

The dissent entirely elides this critical distinction. As *Terry* itself recognized, a frisk "is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment." 392 U.S. at 17, 88 S.Ct. 1868; *see also United States v. Tinnie,* 629 F.3d 749, 756 (7th Cir. 2011) (Hamilton, *J.,* dissenting) ("[W]e must recognize that a frisk is most certainly not a minor intrusion on privacy."). "[I]t is simply fantastic to urge that [a frisk] performed in public by a policeman while the citizen stands helpless, perhaps facing a wall with his hands raised, is a 'petty indignity.'" *Terry,* 392 U.S. at 17-18, 88 S.Ct. 1868. But this "fantastic" notion is precisely what the dissent **\*102** perpetuates by focusing on the minimally intrusive order to exit the car while minimizing the maximally intrusive order to position himself in a way that can only constitute a search. We cannot forget the *Terry* Court's admonition that a frisk "is not to be undertaken lightly." 392 U.S. at 17, 88 S.Ct. 1868. Officer Tom's actions in ordering Weaver to step out of the car and assume a position with his hands on the trunk and feet spread apart were undertaken solely in order to frisk Weaver. That is why Officer Tom's order marks the point at which reasonable suspicion that Weaver was armed and dangerous was required.

Second, the dissent claims that considering this order of Officer Tom's to be the initiation of the search runs afoul of the principle that an officer's subjective intentions in frisking are irrelevant. It is true, as the dissent says, that precedent instructs us to turn a blind eye to an officer's subjective intentions in stopping, searching, or seizing. *See Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). But this means only that we must ignore intent in determining *why* the officer took the challenged action. It does not preclude us from looking at intent in determining *when* the action was initiated. *See United States v. Williams,* 731 F.3d 678, 686 (7th Cir. 2013) (analyzing "the circumstances that [the officer] may have relied upon in *deciding* to frisk [the defendant]" (emphasis added)).

**\*\*6** The dissent's conflation of these two inquiries would significantly narrow the scope of judicial review over police actions in a manner inconsistent with the Fourth Amendment's reasonable-suspicion requirement. Because the purpose of our inquiry is to ensure that reasonable suspicion was present to justify a frisk, *see Terry,* 392 U.S. at 20, 88 S.Ct. 1868; *see also Mimms,* 434 U.S. at 109, 98 S.Ct. 330 (explaining that reasonableness serves to protect the individual's right to be "free from arbitrary interference by law officers"), it makes little sense to rely on conduct postdating the decision to frisk. Any subsequent events could not possibly factor into that decision.

According to the dissent, a frisk only begins when an officer lays hands on an individual. We cannot agree with such a formalistic view. "This narrow definition of a frisk would require us to close our eyes to reality and would encourage aggressive and intrusive police tactics, especially during pre-textual traffic stops. ... Bent over the hood of a car or pressed against a wall in the middle of the night, most people would be extremely nervous and disoriented. It would be easy

enough for an enterprising officer to find some justification for a frisk in any nervous responses," or behavior, "at such a vulnerable moment." *Tinnie*, 629 F.3d at 759 (Hamilton, J., dissenting). To assume, as the dissent does, that a search only begins once there is physical contact would contradict long-standing precedent that our analysis under 🚩 *Terry* must be "flexible enough to be applied to the whole range of police conduct in an equally broad range of settings." 🚩 *Michigan v. Chesternut*, 486 U.S. 567, 574, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988). For these reasons, we respectfully disagree with the dissent's belief that the majority's approach is "erroneous and problematic."

## II. Whether Reasonable Suspicion Was Present

Because reasonable suspicion must be present at the inception of the frisk, 🚩 *Terry*, 392 U.S. at 20, 88 S.Ct. 1868, we therefore only consider the following acts in determining whether there was reasonable suspicion that Weaver was armed and dangerous: (1) Weaver's staring at the **\*103** unmarked police car as it drove by; (2) Weaver's adjustment of his waistband while walking; (3) Weaver's statement that he had nothing on him; and (4) Weaver's pushing down his pants and wiggling back and forth while in the passenger seat.

The Government's strongest fact is Weaver's movements in the passenger seat, which Officer Tom described as "with both hands kind of pushing down on his pelvic area and squirming kinda in the seat left and right, shifting his hips." App'x at 158. Officer Tom believed that Weaver was "trying to push something

down." App'x at 159. But nothing in Officer Tom's description that Weaver was squirming and trying to push something down suggests that this "something" was a weapon. Weaver's actions were equally consistent with the act of secreting drugs or other nonhazardous contraband.

The distinction between the two is key, as is illustrated in our recent case 🚩 *United States v. Hussain*, 835 F.3d 307 (2d Cir. 2016). In 🚩 *Hussain*, an officer pulled over a car that defendant Cunningham was driving after it ran a stop sign. 🚩 *Id.* at 310. After the car had been pulled over, the officer "observed Cunningham's arm move up and down in the middle console area." 🚩 *Id.* The officers also noticed that the passenger in the front seat of the car was sitting in an "unnatural" position that the officers believed was meant to obscure the front seat of the car from view. 🚩 *Id.* at 311. As an officer approached the car, he saw Cunningham with a cellphone in his right hand. 🚩 *Id.* at 310. Cunningham was ordered out of the car, and when he complied, he told the officer that he had a knife in his pocket (which was a legal pocket knife). 🚩 *Id.* at 311. After discovering the pocket knife, the officer searched Cunningham's car and discovered a loaded gun under the front passenger seat. 🚩 *Id.* We held that the search was unconstitutional. Although we acknowledged that "each of the officers subjectively suspected that Cunningham and [the passenger] were hiding something and up to no good," we concluded that the officers had not pointed to articulable facts indicating that Cunningham posed a danger to them. 🚩 *Id.* at 314. We

noted that the officers knew Cunningham was holding a cellphone, not a firearm, in the car. 🔖 *Id.* at 315-16. We also rejected reliance on the passenger's unnatural seated position, reasoning that it "may have been enough to believe that [the passenger] sought to hide something. But insofar as dangerousness is the sole focus of our attention under 🔖 Long, [the passenger's] position by itself sheds insufficient light on whether he was hiding something dangerous." 🔖 *Id.* at 316.

**7 🔖 *Hussain* is instructive in the present case. We have no doubt that Officer Tom reasonably suspected that Weaver was hiding *something* based on his downward motion and wiggling. But there are no specific or articulable facts that Weaver was hiding something *dangerous*.[4] As 🔖 *Hussain* and Supreme Court precedent establish, there is a distinction between hiding something and hiding something dangerous. It is not enough that officers rely on a suspicion that a suspect was hiding something, even if that something is contraband like drugs—rather, officers must have a **\*104** suspicion based on articulable facts that the suspect was "hiding something dangerous." 🔖 *Id.* For this reason, Weaver's actions in the front passenger seat did not provide the SPD with an objectively reasonable belief that he was armed and dangerous.[5]

[4]     Indeed, in its decision, the district court found only that Officer Tom believed Weaver was "concealing *something*"— not something dangerous. App'x at 218 (emphasis added). This is consistent with Officer Tom's

testimony at the suppression hearing, during which he said only that Weaver's movements were consistent with hiding "something"; he did not testify that he believed the movements were consistent with hiding something *dangerous*. App'x at 159. We also note that Officer Tom asked Weaver to reach into his pocket and pull out his identification, a fact which certainly calls into question whether the officers believed that Weaver possessed something dangerous.

[5]     Our discussion on this point also addresses the Government's reliance on Weaver's statement to Officer Tom that he "don't got nothin'." App'x at 159. Even if this statement could be interpreted to support Officer Tom's suspicion that Weaver possessed something illegal, nothing about this statement suggests that Weaver possessed something dangerous.

The other facts present also fail to support an objectively reasonable suspicion that Weaver was armed and dangerous. The Government points to Weaver's adjustment of his waistband to bolster its claims. We are not convinced that this action signals that Weaver carried a weapon on his person. Officer Tom testified that Weaver made a "subtle tug of his waistband." App'x at 152. But given that Weaver's pants were lower than waist level, such a subtle tug is no more suggestive of a firearm than it is of Weaver simply wanting to raise his pants because they slipped lower than he preferred.[6] In other words, we cannot say that an objectively reasonable officer who witnessed such an

action would conclude that Weaver carried a firearm.

6      The dissent makes the assertion that Weaver's tug "suggest[s] that something hefty could be weighing down his pants." This is a purely post hoc rationalization. The tug was slight, and there was no other reason at this point to suspect Weaver had a firearm. We are hard-pressed to see how a rational officer at the scene would take the dissent's view.

This differentiates Weaver's case from *United States v. Padilla*, 548 F.3d 179 (2d Cir. 2008), in which we held that the officer had reasonable suspicion that Padilla was armed and dangerous. In doing so, one of the facts (among several others suggesting suspicious circumstances) that we relied on was Officer O'Brien's testimony that he saw Padilla adjust something in the center of his waistband in a manner "consistent with the adjustment of a gun lodged in one's waistband" but *not* "consistent with any innocent explanation" based on his experience in making nearly ten arrests of suspects carrying firearms in their waistbands and how his colleagues adjusted their waistbands when carrying firearms. *Id.* at 183. The magistrate judge, who twice requested that Officer O'Brien make the same gesture at the suppression hearing, similarly characterized it as a "distinctive gripping motion, as if holding and adjusting (first up and then down) something comparable in size, shape, and heft to a handgun." *Id.* at 184 (internal quotation marks omitted). This " 'distinctive' consistency with the adjustment of a firearm" was the focus of much of

our analysis. *Id.* at 189. Given the lack of any "distinctive consistency" in the case at hand—coupled with the lack of other suspicious facts present in *Padilla*, like Padilla's choice to eschew the lighted path and instead follow a suspected drug user down a dark path at night[7]—we do not believe Weaver's subtle tug at his waistband supports an objectively reasonable suspicion **\*105** that he was armed.[8]

7      There are no shortage of facts distinguishing Weaver's case from *Padilla*, but we highlight just one such fact here in particular. Namely, while Officer O'Brien saw Padilla reach into his clothing such that Padilla may have been reaching for his weapon, *Padilla*, 548 F.3d at 183, Officer Tom saw Weaver pushing something so far down his pants that no bulge was noticeable, suggesting that Weaver was attempting to make that item inaccessible. Practically speaking, then, Officer O'Brien had much greater cause for concern that the suspect was "armed and *dangerous*" than did Officer Tom.

8      The dissent believes the majority misreads *Padilla* and by focusing on how the movement in *Padilla* was inconsistent with any innocent explanation. Respectfully, the dissent misreads the majority opinion. We highlight the singular nature of the movement in *Padilla* only to explain why this case does not compel a finding

of reasonable suspicion here. As we have said, it is the absence of this distinctive consistency factor *and* other suspicious actions present in *Padilla* that makes *Padilla* distinguishable.

**\*\*8** The final bases offered by the Government are so meritless they warrant little discussion. One is Weaver's presence in a high-crime area. While relevant, this factor does not necessarily "contribute meaningfully to a finding of reasonable suspicion." *See Freeman*, 735 F.3d at 101. We cannot say that it contributes meaningfully here. The stop and frisk of Weaver occurred during daylight, [9] and Officer Tom acknowledged that he did not witness Weaver or the other occupants of the car engaging in criminal activity. The other basis the Government puts forth is Weaver's staring at the unmarked police vehicle as it drove by. Officer Tom testified that as their vehicle drove past Weaver, he stared at the car for "a few seconds." App'x at 174. Besides the fact that there is nothing objectively unusual about staring at an unmarked car with tinted windows driving by slowly, citizens are well within their rights to stare at others in public, including police officers. Very little, if anything, can be gleaned from such an act. *Cf. Dancy*, 843 F.3d at 110 ("[L]ooking over one's shoulder at an officer in slow pursuit is not suspicious behavior."). To conclude otherwise would yield the troubling result of adverse consequences for the exercise of basic rights—something we see far too much of in the case law as it is. *See generally* I. Bennett Capers, *Criminal Procedure and the Good Citizen*, 118 Colum. L. Rev. 653 (2018).

[9] The dissent emphasizes Officer Tom's testimony that it was dusk. While testifying that it was dusk, Officer Quonce twice confirmed that it was "still light out." App'x at 116, 144.

The dissent takes issue with our conclusion that there is nothing unusual about Weaver's staring. It believes that it indicates that Weaver was "attempting to avoid police surveillance." But such an inference is insupportable. Given that the vehicle was unmarked, and therefore Weaver would not have known that it contained police officers, the dissent makes too great a leap. And even if Weaver had been concerned about encounters with the police, the hard reality is that, in light of incidences of police brutality and discriminatory policing, minority citizens across the country fear encounters with the police, whether guilty or innocent. *See Utah v. Strieff*, —— U.S. ——, 136 S. Ct. 2056, 2070, 195 L.Ed.2d 400 (Sotomayor, *J.*, dissenting) ("For generations, black and brown parents have given their children 'the talk'—instructing them never to run down the street; always keep your hands where they can be seen; do not even think of talking back to a stranger—all out of fear of how an officer with a gun will react to them."); *Illinois v. Wardlow*, 528 U.S. 119, 132, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (Stevens, *J.*, concurring in part and dissenting in part) (explaining that "[a]mong some citizens, particularly minorities and those residing in high crime areas," there may be a belief "that contact with the police can itself be dangerous"). [10]

[10] The dissent makes a similar presumption when it claims that the

rear passenger of the vehicle "appears to have been 'about to flee,' as Officer Tom's partner put it rather than being caught by law enforcement in the [dangerous or illicit] item's vicinity." The record is bereft of any indication as to why the rear passenger opened the door, and we therefore cannot say what his intentions were. But we are wary of imputing his conduct to Weaver. *See* United States v. I.E.V., 705 F.3d 430, 438 (9th Cir. 2012) (rejecting the district court's partial reliance on the defendant's proximity to a "fidgety" individual in assessing whether the frisk of the defendant was constitutional).

**\*106** In sum, we do not believe that any of the facts the Government raises can support an objectively reasonable suspicion that Weaver was armed and dangerous. Whether assessed independently or collectively, *at most* the SPD had a reasonable suspicion that Weaver was hiding something. But the Fourth Amendment requires more.

The dissent disagrees. Despite agreeing that a *Terry* frisk involves a "more specific analysis, requiring the officer to hold a reasonable suspicion that the subject is 'armed and dangerous' as opposed to being generally suspicious," *Williams*, 731 F.3d at 686 (citation omitted), the dissent would have us hold that Weaver's ambiguous conduct gave rise to reasonable suspicion that he was armed and dangerous. According to the dissent, the presence of alternative explanations does not negate reasonable suspicion. But what we must look at is "the degree of suspicion that

attaches to particular types of noncriminal acts." *United States v. Sokolow*, 490 U.S. 1, 10, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). We agree that officers are not required to rule out every innocent explanation, but that does not mean, as the dissent would have us believe, that any conduct consistent with, or possibly suggestive of, weapon possession satisfies the reasonable-suspicion standard. That proposition is belied by our decision in *Hussain*, 835 F.3d at 316. And while we give "due weight" to officers' reasonable inferences, *Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), due weight is not determinative weight.

**\*\*9** The importance of Fourth Amendment rights demands careful scrutiny of those facts offered by the police to support reasonable suspicion. This need is perhaps even greater when searches or seizures do result in criminal evidence. "When a search uncovered criminal evidence, enterprising cops soon learned what was expected of them: an additional fact besides the violation of some traffic law. Articulating something out of the ordinary—a nervous glance, shaking hands, a revealing smell—when asked for one in a court of law was especially easy when they caught someone red-handed." Sarah A. Seo, Policing the Open Road 237 (2019). But as Seo explains, "Requiring an 'unusual' fact did little to eliminate pretextual stops." *Id*. "In practice, more often than not, 'all the facts and circumstances' rationalized discretionary"— and often discriminatory, we might add —"policing of people who were, in fact, guilty." *See id*. [11]

11    The dissent laments that "the majority ... forgets the[ ] lessons of the Warren Court" regarding the dangers facing officers. It worries that our decision today invites unnecessary risks for officers and threatens to undermine the safety of "the broader community." We think such a concern to be overstated, and to the extent the dissent devolves into such speculation on consequences, we caution that unfettered deference to officer discretion paves the road for the sort of threats to community safety the dissent augurs.

"The erosion of Fourth Amendment liberties comes not in dramatic leaps but in small steps ...." *Tinnie*, 629 F.3d at 754 (Hamilton, *J.*, dissenting). Drawing the inferences the dissent asks us to draw and concluding that such weak facts support reasonable suspicion would be far reaching. Officers could subject individuals to the humiliations and dignitary harms incident to unwarranted frisks based on mundane acts, such as a look, a nervous response, or an adjustment of one's clothes. This unfettered discretion in turn "could lead to harassment of minority groups and severely exacerbate police-community tensions." *Dancy,* 843 F.3d at 111 (internal quotation marks and citation omitted).

As we have seen time and again, such harassment is neither new nor innocuous, as carefully documented in Seo's book. Seo notes that "midcentury Americans recognized, to varying degrees, that the police picked on racial minorities." Seo, Policing the Open Road 169. Seo explains that like white citizens, "Black citizens were also policed in their cars, but the experience for them was often much more terrifying than a series of nosy questions." *Id.* at 214. Communities should not have to "decide between their constitutional rights against unwarranted searches and seizures" and "governmental protection that is readily afforded to other communities." *United States v. Curry*, 965 F.3d 313, 333 (4th Cir. 2020), as amended (July 15, 2020), as amended (July 16, 2020) (Gregory, *C.J.*, concurring).

**\*107**   Because the officers lacked an objectively reasonable belief that Weaver was armed and dangerous, the frisk was unconstitutional, and the firearm seized must be suppressed as the fruit of an unconstitutional search.

## CONCLUSION

For the foregoing reasons, we reverse and remand the district court's denial of Weaver's motion to suppress.

Guido Calabresi, Circuit Judge, concurring:
I agree completely with the majority opinion and join it fully. I write separately to express my concern with the state of the law in this area and with how we got to where we are.

The ordinary person looking at the facts of this case would, I believe, no doubt conclude that

the officers decided to search Weaver because of a hunch or a stereotype, and then went about finding a way to search him. [1] After all, neither seeing a man pull up his sagging pants nor watching that same man stare at a car with tinted windows for a few seconds are plausible grounds for suspicion. Yet these actions led the police to take their next steps. Weaver got in a car, and the driver of that car then failed to signal within one hundred feet of turning. The police stopped the car. The search followed. One might ask, how often are most people stopped and arrested for failing to signal—let alone failing to signal within a hundred feet of turning? And even if one is stopped for such a trivial traffic offense, how often would a passenger in the offending car be made to exit the vehicle, spread eagle himself against the car, and subsequently be frisked?

[1]     Of course, precedent instructs that we must turn a blind eye to the officer's subjective intent in stopping, searching, or seizing. *Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Upon learning this, an ordinary person might wonder whether this instruction makes it much harder for courts to address police violations of the Fourth Amendment.

The ordinary person, looking at these facts, would, I believe, readily say: The officers wanted to search Weaver, they found a way, and hey, they were right. He was a felon with a gun and cocaine.

I think the majority is correct that what was done here violated the Fourth Amendment's prohibition of unwarranted searches and seizures, and I join the court's opinion. The New York courts reached the same conclusion and excluded the same evidence when a state conviction was sought in the same case. To allow the evidence would, as the majority opinion says, require us to go beyond what we have allowed in the past. But while I disagree with the dissent, and believe in this case the police went too far, I must concede that my learned and respected colleague in dissent does not stretch the law all that much in arguing that the evidence the officers found should be admitted.

**\*108**   To put it another way, although there is a gap between police action in this case and police action in cases where we found the search was justified, like *United States v. Padilla*, 548 F.3d 179 (2d Cir. 2008) (in whose holding I reluctantly joined), the gap is not enormous. My dissenting colleague argues that we should close that gap. And yet such a result would, in my judgment, and I believe that of the ordinary person, be absurd if the constitutional mandate against unreasonable searches and seizures is to have any meaning. As important, the result would go yet further in making those whom the police suspect and dislike subject to humiliating treatment and abuse which, not incidentally, is what *Terry v. Ohio* warned against. 392 U.S. 1, 15, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ("Under our decision, courts still retain their traditional responsibility to guard against police conduct which is over-bearing or harassing, or which trenches upon personal security without the objective evidentiary justification which the Constitution requires.").

How did we get to the point where behavior that to the ordinary person would seem to be a manifestly unreasonable search is, on the law, a close case? I believe it is the result of the confluence of two unfortunate doctrines—supported by opposite sides of the political spectrum—the exclusionary rule and qualified immunity.

The exclusionary rule, as a way of controlling police behavior, has been a disaster, I think. Don't get me wrong: some way of keeping the police from undertaking unreasonable searches and seizures is essential. And exclusion of wrongfully found evidence seems a plausible way. But in practice its effect has been a slow and steady erosion of rights to be free from unreasonable searches.

Courts are—and should be—guided by precedents. A case asserting an improper search and the exclusion of evidence there found is likely to be, on its facts, just a step beyond a prior case in which police behavior was justified. The precedents might not compel the court to take that next step, but another factor will all too frequently bring that about: the defendant seeking exclusion *is almost always guilty of something* and might be dangerous. As in the case before us, the officers' hunch or stereotype was correct! Courts do not want to release criminals, those who have done and may again do harm. And so, often and understandably, courts have taken "the next step," for to do otherwise would have led to the release of a felon. This "next step" case then becomes the precedent for the subsequent "close case." Through a series of holdings, each one driven by the desire to avoid excluding determinative evidence,

we have approved one after another form of increasingly unreasonable police action, until we find ourselves reviewing actions that would, on their face, seem obviously improper but which, instead, on our precedents, on governing law, are "close."

This string of "next step" precedents comes at a cost that courts cannot easily address. What about all the cases in which the police behavior turned out to be unjustified? What about all the cases in which the hunch or the stereotype was wrong, and an honest person was humiliated, searched, and all too often maltreated? Why don't the courts see those cases, and in them set down rules reinforcing the constitutional mandate? Recent events more than suggest that a multitude of such cases exist. These cases lead to distrust and even hatred of the police, with dire consequences. Why don't these cases get to court?

**\*109** The reason is obvious. Persons so searched may well not know that they can bring a lawsuit, or they may be too disaffected to sue. But even if they go to a lawyer, the lawyer will tell them—ah yes, you have been mistreated, but you won't recover; the case is fairly close and so the officer would surely have qualified immunity. Sue if you want, but I can't take your case on a contingent fee because the odds are too great that, though the behavior was wrong, under current precedents, we won't win. And, by the way, you will most likely not even get a decision on whether the behavior was wrong, because the court is unlikely to reach that question given the presence of qualified immunity. *See* *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (eliminating the requirement that courts

first decide whether a public official's conduct violated the Constitution before reaching qualified immunity).

There may well be hundreds of situations in which searches like the one before us today turned up nothing. But surely no more than a handful will get to court. And even these will almost always get decided against the innocent "searchee" on qualified immunity. All this might not matter if courts knew, directly and emotionally, from personal experience, the stories of those unnecessarily, improperly, and humiliatingly searched. But we judges, and our families and friends, are not likely to be the ones whom the police decide to search on a hunch. We are not likely to be stopped for failing to signal. And we are most unlikely to be made to spread eagle, even if stopped.

My dissenting colleague is correct that this case is not that many steps beyond *Padilla*, which itself was only a step or two from the prior precedent. *See United States v. Bayless*, 201 F.3d 116 (2d Cir. 2000). But these are steps we must not take, and so I join the majority opinion.

I write this concurrence in sadness and in hope. It is not for me or for other judges to find a way out of our current dilemma, hence my sadness. Yet recent events have focused attention on the qualified immunity doctrine. [2] And some have even suggested alternatives to the exclusionary rule. [3] (Wearing my academic hat, I **\*110** have done so myself—but, as is usually the case with purely academic suggestions, it can only be a beginning. *See* Guido Calabresi, *The Exclusionary Rule*, 26 HARV. J. L. & PUB. POL'Y 111 (2003).) It is this current attention that gives me hope.

[2] Both judges and academics have criticized the doctrine in recent years. *See, e.g., Ziglar v. Abbasi,* —— U.S. ——, 137 S. Ct. 1843, 1870–72, 198 L.Ed.2d 290 (2017) (Thomas, J., concurring in part and concurring in the judgment); *Kisela v. Hughes,* —— U.S. ——, 138 S. Ct. 1148, 200 L.Ed.2d 449 (2018) (Sotomayor, J., joined by Ginsburg, J., dissenting); *Zadeh v. Robinson,* 902 F.3d 483, 498 (5th Cir. 2018) (Willet, J., concurring dubitante), *withdrawn on reh'g by Zadeh v. Robinson,* 928 F.3d 457 (5th Cir. 2019); *Jamison v. McClendon,* —— F. Supp. 3d ——, 2020 WL 4497723 (S.D. Miss. 2020) (Reeves, J.); *Thompson v. Clark,* 2018 WL 3128975, at *11 (E.D.N.Y. June 26, 2018) (Weinstein, J.); Joanna C. Schwartz, *The Case Against Qualified Immunity*, 93 NOTRE DAME L. REV. 1797 (2018); William Baude, *Is Qualified Immunity Unlawful?*, 106 CAL. L. REV. 45 (2018). *See also* Jon O. Newman, Opinion, *Here's a*

*Better Way to Punish the Police: Sue Them for Money*, WASH. POST (June 23, 2016), https:// www.washingtonpost.com/opinions/ heres-a-better-way-to-punish-the-police-sue-them-for-money/2016/06/23/ c0608ad4-3959-11e6-9ccd-d6005beac8b3_story.html; Stephen R. Reinhardt, *The Demise of Habeas Corpus and the Rise of Qualified Immunity: The Court's Ever Increasing Limitations on the Development and Enforcement of Constitutional Rights and some Particularly Unfortunate Consequences*, 113 MICH. L. REV. 1219, 1222 (2015). As I am writing this, some state legislatures are considering or have acted to modify qualified immunity. *See, e.g.*, Conn. HB 6004; Colo. SB 20-217.

3    *See, e.g.*, Miriam H. Baer, *Pricing the Fourth Amendment*, 58 WM. & MARY L. REV. 1103 (2017); Avani Mehta Sood, *Cognitive Cleansing: Experimental Psychology and the Exclusionary Rule*, 103 GEO. L.J. 1543 (2015); Ronald J. Rychlak, *Replacing the Exclusionary Rule: Fourth Amendment Violations as Direct Criminal Contempt*, 85 CHI.-KENT L. REV. 241 (2010).

Finding an answer will not be easy. It will require careful and coordinated thought by the political branches, by the academy, and by judges as well. But we must do better. The noxious effects of our current approach are all too obvious, and are manifested both broadly,

in the current protests, and narrowly, in the instant case.

Given where the law is, and the need to avoid further erosion of Fourth Amendment rights, I fully join the majority in its holding that what the officer did here went too far, and hence that the evidence must be excluded. Can we do better? I certainly hope so.

Debra Ann Livingston, Chief Judge, dissenting:

It was dusk as Officer (now Detective) Jason Tom approached the vehicle in which Calvin Weaver was a passenger. Officer Tom, then a two-year veteran of the Syracuse Police Department's Gang Violence Task Force, was patrolling a dangerous neighborhood on the near west side of Syracuse where "[t]here's a typically high volume of shots fired [and] gun-related crime," App'x 93, and where "there are regularly shots fired, there's been multiple homicides, stabbings, shootings," App'x 150. When the gray sedan in which Weaver was riding was lawfully pulled over for a traffic infraction, a rear door quickly opened into traffic—as if the passenger inside, who remained in the car only on the express direction of police, was "about to flee from the vehicle." App'x 103. And as Officer Tom neared the front passenger seat, he observed the passenger, later identified as Weaver, acting in a manner that Officer Tom, even with some six years of experience as a police officer, found both highly unusual and frankly alarming:

> As I'm approaching the vehicle, I see the front

passenger slouched down pushing down his pelvic area and kind of squirming in his seat. I'm not up to the front of the window yet to see his head, I can just see, from my vantage point I can see his pelvic area, his lower part of his body, his hands. ... As I'm approaching the vehicle ... I can see into the cabin of the vehicle clearly, I see the front passenger with both hands kind of pushing down on his pelvic area and squirming kinda in the seat left and right, shifting his hips.

App'x 158. Weaver was using both hands in a "[d]ownward motion, trying to push something down." App'x 159. Officer Tom, "concerned because it's abnormal that he's making these movements," ordered Weaver to "show ... [his] hands." [1] App'x 159.

[1] Officer Tom by this time had confirmed that Weaver was the same individual who had drawn Officer Tom's attention earlier that evening when Weaver, then walking on the street, had stared at the officers' unmarked tan Buick as it went by: "As we were driving past him, he stared into our vehicle, continued to stare, as we approached, as we passed, and continued to stare as we proceeded past him." App'x 92, 150–51. Officer Tom at that time also observed that Weaver pulled up his waistband as Weaver walked in the direction of the

gray sedan and thereafter got in—a movement suggesting that something hefty could be weighing down his pants. App'x 152–53.

By the time Weaver stepped out of the car at Officer Tom's direction, Officer Tom had his own hand on his holstered firearm, "suspicious of [Weaver's] actions." App'x 162. This caution proved justified. The protective frisk that Officer Tom initiated once Weaver was out of the car revealed a **\*111** fully loaded semiautomatic handgun in Weaver's pants—a handgun with a detachable magazine locked into place, ready for use. *See* App'x 110.

The majority admits that Officer Tom's observations, along with others recounted herein, left "no doubt that Officer Tom reasonably suspected that Weaver was hiding *something*" on his person. Majority Opinion ("Maj. Op.") 103–04. But because the evidence adduced by Officer Tom does not rule out the possibility that this "something" was merely illicit, and not dangerous, the majority concludes that Officer Tom violated the Fourth Amendment by frisking Weaver and securing the loaded handgun (with an obliterated serial number) that Weaver, a convicted felon, could not lawfully possess. Maj. Op. 96–97.

As I explain below, this is a startling and untenable conclusion. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), does not limit protective frisks to circumstances in which the officer *knows* that a suspect is armed and dangerous, but permits frisks based on the reasonable belief that a suspect *may* pose such a threat, even when the suspect's conduct is "ambiguous and susceptible of an

innocent explanation," *Illinois v. Wardlow*, 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). The Warren Court recognized that "a rigid and unthinking application of the exclusionary rule" to condemn "legitimate and restrained investigative conduct" (such as a protective frisk in the circumstances here) would represent but a "futile protest" against *abusive* police, for whom the exclusion of evidence is an ineffective remedy. *Terry*, 392 U.S. at 15, 88 S.Ct. 1868. At the same time, such an approach would "exact a high toll in human injury and frustration of efforts to prevent crime." *Id.*

The majority's decision today forgets these lessons of the Warren Court and thus undermines the safety of suspects and officers, not to mention the broader community. Moreover, the majority's analysis is wholly inconsistent with the Supreme Court's repeated admonitions that the Fourth Amendment's touchstone is reasonableness, *see, e.g.,* *Heien v. North Carolina*, 574 U.S. 54, 60, 135 S.Ct. 530, 190 L.Ed.2d 475 (2014) (noting Court's repeated affirmation that "the ultimate touchstone of the Fourth Amendment is 'reasonableness' " (quoting *Riley v. California*, 573 U.S. 373, 381, 134 S.Ct. 2473, 189 L.Ed.2d 430 (2014))), and that "the determination of reasonable suspicion," premised "on commonsense judgments and inferences about human behavior," *Wardlow*, 528 U.S. at 125, 120 S.Ct. 673, requires "considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause," *Kansas v. Glover*, —— U.S. ——, 140 S. Ct. 1183, 1187, 206 L.Ed.2d 412 (2020).

Because the Fourth Amendment does not lead in the direction that the majority would go, I respectfully dissent.

## I

The majority's discussion at least begins in the right place: *Terry* and its progeny recognize that it would be "clearly unreasonable" to deny police officers in appropriate circumstances the ability to conduct a protective search for weapons when investigating a suspect at close range. Maj. Op. 99–100; *see also* *Terry*, 392 U.S. at 24, 88 S.Ct. 1868; *Michigan v. Long*, 463 U.S. 1032, 1049–50, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983); *Arizona v. Johnson*, 555 U.S. 323, 327, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009). The Supreme Court has repeatedly said that the "protection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger." *Long*, 463 U.S. at 1049, 103 S.Ct. 3469; *see also* **\*112** *Johnson*, 555 U.S. at 327, 129 S.Ct. 781 ("To justify a patdown of the driver or a passenger during a traffic stop, ... the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous."). This carefully articulated standard in no way authorizes a protective search on the occasion of just any traffic stop. But the Court has underscored more than once "that roadside encounters between police and suspects are especially hazardous," *Long*, 463 U.S. at 1049, 103 S.Ct. 3469, that an "inordinate risk confront[s] an officer as he approaches a person seated in an automobile," *Pennsylvania v. Mimms*, 434 U.S. 106,

110, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (per curiam), and that it is " 'too plain for argument' " that the public interest in officer safety in such encounters is " 'both legitimate and weighty,' " *Maryland v. Wilson*, 519 U.S. 408, 412, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997) (quoting *Mimms*, 434 U.S. at 110, 98 S.Ct. 330). Frisks in the context of traffic stops (like frisks generally) are thus constitutionally reasonable on considerably less than either a preponderance of the evidence or probable cause to believe that a suspect is armed and poses a threat: "[W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity *may* be afoot and that the persons with whom he is dealing *may* be armed and presently dangerous ... he is entitled for the protection of himself and others in the area to conduct" a protective frisk. *Terry*, 392 U.S. at 30, 88 S.Ct. 1868 (emphasis added).

The majority acknowledges that the stop of the automobile in which Weaver was a passenger was lawful and expresses "no doubt" that Weaver engaged in conduct, albeit ambiguous, that gave Officer Tom reasonable suspicion that "Weaver was hiding *something*," Maj. Op. 103–04 —conduct that included, in my view, not only Weaver's unusual seat movements suggesting that he was "trying to push something down," App'x 159, but also his behavior in staring at an unmarked police car as it passed by, adjusting his waistband, and volunteering, "I don't got nothin'," App'x 159, as soon as Officer Tom reached the car. To the list of circumstances giving Officer Tom reason to be suspicious of the car's occupants, I would add the rear driver's side door opening

up into traffic after the officers stopped the gray sedan, App'x 103–104, and the fact that the stop occurred in a high crime neighborhood at dusk, App'x 149–50.

The majority improperly evaluates these facts piecemeal, discarding each as insufficient to create reasonable suspicion.[2] *See* **\*113** *United States v. Arvizu*, 534 U.S. 266, 274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) ("The court's evaluation and rejection of ... factors in isolation from each other does not take into account the 'totality of the circumstances.' "). But the majority *first* goes astray by declining even to consider relevant facts that took place after Weaver exited the car: namely, that when asked to put his hands on the car with his feet spread apart, Weaver attempted to conceal the loaded handgun in the area of his groin by positioning his pelvis very close to the car and taking only a very "small step back" when asked to reposition so that Officer Tom could perform the frisk.[3] App'x 162–63.

[2]     The majority insists to the contrary. Maj. Op. 100 n.2. But as set forth below, the majority, among other things: (1) dismisses Weaver's effort to "push something down" as Officer Tom approached him on the theory that this action was "consistent with the act of secreting drugs or other nonhazardous contraband," Maj. Op. 103; (2) disregards the adjustment of Weaver's waistband because it is "not convinced that this action signal[ed] that Weaver carried a weapon on his person" as opposed to "simply wanting to raise his pants," Maj. Op. 104; and

(3) sees "nothing objectively unusual" about Weaver's staring at the unmarked police vehicle as it passed by, Maj. Op. 105, or that even after the vehicle passed Weaver, "he still appeared to be looking at [the] car" as Weaver stood next to the passenger's side of the gray sedan, App'x 95. The majority also wholly discounts the dangerous character of the neighborhood on the basis, *inter alia*, that "[t]he stop and frisk ... occurred during daylight." Maj. Op. 105. (Officer Tom testified that it was dusk. App'x 149.) I do not see how this is not, contrary to precedent, "spinning out innocent explanations for each factor piece by piece or substituting [the majority's] view, in hindsight, for that of an experienced officer," rather than "consider[ing] the entire picture—as understood by the officer—to determine whether his suspicion had a reasonable basis." *United States v. Santillan*, 902 F.3d 49, 57 n.2 (2d Cir. 2018).

3    Weaver told Officer Tom that Weaver was unable to step back because the ground was slippery, but Officer Tom testified that he observed nothing on the ground to lend credence to this excuse. App'x 163. Parenthetically, Weaver's attempt to conceal the loaded firearm by placing his pelvic area against the car continued even *after* the frisk commenced, requiring Officer Tom first to "pull[ ] [Weaver] the distance where [Officer Tom] wanted [Weaver] to be at so [Officer Tom could] effectively do a pat frisk," and then, as Weaver continued to press his pelvis against the car, to place him in handcuffs. App'x 164.

The majority determines that it may not consider these additional facts because the frisk supposedly "was ... initiated," not when the frisk began, but "no later than the moment when Officer Tom directed Weaver" to place his hands on the trunk of the grey sedan with legs spread apart. Maj. Op. 101–02. To be clear, I conclude that Officer Tom had reasonable suspicion for a protective frisk whether or not Weaver's actions in attempting to position his pelvic area against the grey sedan are considered. But the majority's conclusion that a frisk commences when an officer (supposedly) decides to perform a frisk and orders a suspect to assume what the majority terms an "in search" position is both erroneous and problematic.

First, this approach is contrary to *Terry* itself, which defines a frisk as "a limited search of the outer clothing for weapons," not as a directive to put one's hands on the hood of a car. 392 U.S. at 24, 88 S.Ct. 1868; *see also Frisk*, Black's Law Dictionary (11th ed. 2019) (defining a "frisk" as "[a] pat-down search to discover a concealed weapon"). It is precisely because this search "of the outer surfaces of a person's clothing all over his or her body in an attempt to find weapons" is "a severe, though brief, intrusion upon cherished personal security" that the *Terry* Court brought it within the Fourth Amendment's coverage and carefully specified the particular requirements that render this physical intrusion constitutionally reasonable. 392 U.S. at 16, 24–25, 88 S.Ct. 1868. In so doing, however, the Court emphatically

did *not* determine that safety-related directives issued during the course of a lawful stop—directives involving no such physical contact—constitute frisks for which reasonable suspicion is required. In *Mimms*, for instance, the Supreme Court determined that once a vehicle has been lawfully stopped, its driver may be ordered to get out of the car because, when assessed against the hazards faced by police in such encounters, this intrusion, far from being a frisk, *is not even a Fourth Amendment event. 434 U.S. at 111, 98 S.Ct. 330*. And *Wilson* made clear that this holding extends to a car's passengers—"that a police officer may as a matter of course" order both drivers and passengers to exit a lawfully stopped automobile. 519 U.S. at 410, 117 S.Ct. 882.

In the course of a lawful stop such as occurred in this case, police sometimes **\*114** request that detainees stand apart from each other; that they step out of a less-than-visible alcove; that they place their hands on their heads, on a wall, in the air, or (as here) on the hood of a car. When employed properly, such commands issue from a commendable caution that protects not only the officer's safety but the detainee's safety, as well as that of others in the vicinity. Officer Tom's testimony that, by the time he asked Weaver "to place his hands on the trunk of the vehicle," App'x 161, Officer Tom had his own hand on his holstered firearm and was "suspicious of [Weaver's] actions" attests to the volatility of such encounters and the need for such directives for the safety of all. App'x 162.

With this backdrop in mind, the majority's approach is inconsistent not only with *Terry*'s definition of a frisk, but also with

its recognition that frisks are constitutionally permissible precisely because it is reasonable for officers acting on the basis of articulable suspicion that a suspect may be armed and dangerous to address their "immediate interest ... in taking steps to assure [themselves] that the person with whom [they are] dealing is not armed with a weapon that could unexpectedly and fatally be used against [them]." 392 U.S. at 23, 88 S.Ct. 1868. To take such steps with due care, however, officers must be positioned to assess reasonable suspicion not "in terms of library analysis by scholars," *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (quoting *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)), but in the context of "the protean variety of ... street encounter[s]"—encounters which "range from wholly friendly exchanges ... to hostile confrontations," and which can "begin in a friendly enough manner, only to take a different turn upon the injection of some unexpected element," *Terry*, 392 U.S. at 13–15, 88 S.Ct. 1868.

With respect, I am "unwilling to send police and judges into a new thicket of Fourth Amendment law," *Arizona v. Hicks*, 480 U.S. 321, 328, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987), that requires them to assess the propriety of a frisk based on the likely judgments of appellate courts regarding an officer's intent in issuing an order or appellate judges' views as to what constitutes an "in search" position. As the New Jersey Supreme Court explained in rejecting the view that a frisk commences based on considerations such as these: "The lack of a bright-line rule [such as 'a frisk begins

when an officer lays hands on a suspect'] in stop-and-frisk cases places police officers in a precarious position. Sometimes in a matter of seconds, an officer must determine whether a protective pat-down is necessary to secure his or her safety." *State v. Smith*, 134 N.J. 599, 621, 637 A.2d 158 (1994); *see also United States v. Gurule*, 935 F.3d 878, 885-86 (10th Cir. 2019) (noting that "even if the officers intended to frisk Gurule after he was on his feet, that does not matter" because the frisk "did not commence until the officer physically manipulated Gurule's right-front pocket"); *United States v. Raymond*, 152 F.3d 309, 312 (4th Cir. 1998) (rejecting view that frisk of suspect commenced when "officers had made the decision to pat him down"); *Commonwealth v. Clemens*, 66 A.3d 373, 381 (Pa. Super. Ct. 2013) (rejecting claim that a frisk commenced on the basis of a verbal order "to stand up and turn around to prepare for the frisk" because "by its very definition, the term 'frisk' requires tactile contact").

Here, the majority concludes that Officer Tom intended to frisk when he requested Weaver to assume what the majority deems an "in search" position. And it argues that precedent permits it to consider Officer Tom's subjective intent, despite Fourth Amendment precedent disfavoring this approach, so long as it does so only in **\*115** "determining *when* the [frisk] was initiated." Maj. Op. ——. There is no authority for this proposition, however. The Supreme Court, to the contrary, has made clear that outside a narrow range of cases not relevant here, it is simply "unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers." *Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct.

1769, 135 L.Ed.2d 89 (1996). Contrary to the majority's position, "the subjective intent of the law enforcement officer is irrelevant in determining whether that officer's actions violate the Fourth Amendment" because "the issue is not his state of mind, but the objective effect of his actions." [4] *Bond v. United States*, 529 U.S. 334, 338 n.2, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000); *see also Brigham City v. Stuart*, 547 U.S. 398, 404, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006) (noting that Supreme Court has "repeatedly rejected" the approach of examining officers' subjective motivations). Thus, even assuming that Officer Tom *did* intend to frisk Weaver when he asked Weaver to position himself at the back of the car, this fact is not relevant. Officer Tom's verbal directive did not constitute a frisk.

[4]     This is true whether such motivations explain why a search or seizure may have occurred, as in *Whren*, or whether challenged conduct *constitutes* a search or seizure, as in *Bond* or, indeed, this very case.

The majority cites no authority for its contrary conclusion. Indeed, several of the decisions the majority relies upon do not support its position. The majority repeatedly invokes the *dissent* in *United States v. Tinnie*, 629 F.3d 749, 754–61 (7th Cir. 2011), but the panel opinion in that case "deemed a frisk not to have begun until the officer actually placed his hands on the defendant," *United States v. Snow*, 656 F.3d 498, 503 n.1 (7th Cir. 2011); *see also Tinnie*, 629 F.3d at 753 & n.3. And in *Dancy v. McGinley*, 843 F.3d 93, 108 (2d Cir. 2016), we concluded that a "stop occurred"—not a frisk

—"at the very latest when [a police officer] instructed [a suspect] not to use his phone." But even then our analysis in *Dancy* did not turn on the officer's intention in issuing a verbal command. It focused on whether, under "all the circumstances, any reasonable person in [the suspect's] situation 'would have believed that he was not free to leave.' "[5] *Id.* at 108 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (opinion of Stewart, *J.*)); *see also* *Florida v. Royer*, 460 U.S. 491, 501–02, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion) (citing Justice Stewart's *Mendenhall* opinion as controlling law).

[5]

Similarly in *United States v. Williams*, 731 F.3d 678, 682–83 (7th Cir. 2013), another Seventh Circuit decision on which the majority relies, Maj. Op. 102, the officer's directive that the suspect "step out from the group and submit to a frisk" was analyzed not as the commencement of the frisk, but as a stop. The majority seeks to elide this distinction, seeing no reason "that a seizure for Fourth Amendment purposes may occur before physical force is used, but on the other hand ... a search only occurs after." Maj. Op. 101 n.3. To be clear, that is not my position. Many searches (such as electronic surveillance) require no physical intrusion. Similarly, many (but not all) seizures are accomplished by means of it. Focusing, then, on the problem at hand—the *Terry* frisk—the frisk commences on physical

contact precisely because it is the greater intrusion occasioned by "[e]ven a limited search of the outer clothing" that requires frisks to be limited to narrower circumstances than stops alone. *Terry*, 392 U.S. at 24, 88 S.Ct. 1868. Equating a frisk with a verbal order is thus "simply at odds with the plain meaning of the term 'frisk' " and with the balance the Court struck in *Terry*. *See Clemens*, 66 A.3d at 382.

In sum, a verbal directive is not a frisk and officer intent has no place in the Fourth Amendment analysis relevant to **\*116** this case. *See United States v. Jackson*, 652 F.2d 244, 251 n.6 (2d Cir. 1981) ("Indeed, even if [the detective] had already planned to search the trunk before probable cause arose, the search would be lawful because, at the moment that the search began, there was probable cause to search it."); *Gurule*, 935 F.3d at 885–86 ("We evaluate the circumstance under an objective standard, and even if the officers intended to frisk [the suspect] after he was on his feet, that does not matter for our analysis."); *Tinnie*, 629 F.3d at 753 ("[I]t is irrelevant that [the officer] decided to frisk [the suspect] before directing him to exit the car."). The majority's contrary conclusion threatens to sow confusion in an area of law pursuant to which police officers must often make quick judgments in tense situations as to whether they have a lawful basis to proceed.[6] The majority errs in its analysis of Fourth Amendment precedent and in its assessment of constitutional reasonableness.

[6]

Indeed, as the New Jersey Supreme Court concluded in *Smith*, even when an officer *announces* his intent

to frisk at a point at which he may not yet have reasonable suspicion, this fact does not commence the frisk and so does not "debilitate the officer so that he will not later be able to perform a pat-down should sufficient facts come to light." 134 N.J. at 621, 637 A.2d 158. Conversely, the majority's approach leaves officers in a "precarious position," *id.,* where they may be unable to do so.

## II

I also diverge from my colleagues in their conclusions regarding "whether [Officer Tom] ha[d] a 'particularized and objective basis' for suspecting" that Weaver was armed and dangerous based on "the 'totality of the circumstances.' " Arvizu, 534 U.S. at 273, 122 S.Ct. 744 (quoting Cortez, 449 U.S. at 417–18, 101 S.Ct. 690). As already noted, Terry itself found "ample factual justification" for a frisk, 392 U.S. at 15, 88 S.Ct. 1868, even though all the conduct that Officer McFadden, the policeman in Terry, observed was "ambiguous and susceptible of an innocent explanation," Wardlow, 528 U.S. at 125, 120 S.Ct. 673. The majority concludes here, however, that while it has "*no doubt*" that Officer Tom reasonably suspected that Weaver was hiding *something*" from police, a frisk was still improper on the theory that something illicit is not necessarily something dangerous. Maj. Op. 96–97, 103–04. But "necessarily something dangerous" is emphatically *not* the Terry standard. And the majority arrives at its startling approach only by ignoring the

Supreme Court's repeated directive that the bases for an officer's suspicion are not to be "evaluat[ed] and reject[ed] ... in isolation from each other," with each treated as " 'perhaps innocent in itself.' " Arvizu, 534 U.S. at 274, 122 S.Ct. 744 (quoting Terry, 392 U.S. at 22, 88 S.Ct. 1868). Indeed, Terry "precludes [the] sort of divide-and-conquer analysis" that the majority employs here. Id.

Officer Tom described Weaver's strange and bizarre movements as Officer Tom approached the car by specifically noting that Weaver "slouched down pushing down his pelvic area and kind of squirming in his seat ... with both hands kind of pushing down on his pelvic area and squirming kinda in the seat left and right, shifting his hips." App'x 158. Based on that motion, Officer Tom concluded that Weaver was "trying to push something down." App'x 159. The majority dismisses this evidence by noting that "Weaver's actions were ... consistent with the act of secreting drugs or other nonhazardous contraband." Maj. Op. 103. But based on what he also knew, Officer Tom could reasonably infer that Weaver was attempting to conceal something that had enough heft that Weaver **\*117** felt the need to adjust his pants while walking only moments before—another basis for suspicion that the majority dismisses as "no more suggestive of a firearm than it is of Weaver simply wanting to raise his pants because they slipped lower than he preferred." [7] Maj. Op. 104. The majority further dismisses the fact that Weaver stared into the tinted windows of Officer Tom's unmarked police vehicle as it passed by, "continued to stare, as [it] approached, as [it] passed, and continued to stare as [it]

proceeded past him," App'x 150–51—a fact from which Officer Tom could reasonably infer that perhaps Weaver was attempting to avoid police surveillance.[8] Finally, the majority also wholly diminishes other factors at play, including that Officer Tom patrolled in a dangerous neighborhood and that whatever Weaver or his associates had in the car was illicit enough or dangerous enough that the rear passenger appears to have been "about to flee," as Officer Tom's partner put it, rather than being caught by law enforcement in the item's vicinity. App'x 103.

[7]    The majority also contends that the adjustment of Weaver's waistband is irrelevant because "there was no other reason at this point to suspect Weaver had a firearm." Maj. Op. 104 n.6. This is error. The adjustment of the waistband is properly considered *in conjunction with* Weaver's highly unusual movements in the car, plus all the other relevant factors. It need not on its own meet the reasonable suspicion standard. This is the very point of the Supreme Court's repeated admonition that the facts are not to be evaluated piecemeal, discarding each as insufficient in isolation. *See Arvizu*, 534 U.S. at 274, 122 S.Ct. 744.

[8]    The majority contends that "such an inference is insupportable" because "the vehicle was unmarked" and "even if Weaver had been concerned about encounters with the police, the hard reality is that ... minority citizens across the country fear encounters with the

police, whether guilty or innocent." Maj. Op. 105. To begin, staring at an unmarked car in an attempt to discern its occupants is entirely consistent with being wary of a police encounter. And while Weaver's concern may have been justified by an innocent fear, Officer Tom could reasonably suspect that it was motivated by a fear of being stopped while possessing a gun and drugs—as Weaver ultimately was. The law does not require that police officers —or courts—make all inferences in favor of the suspect. Quite the opposite: we must "give due weight to inferences drawn ... by ... local law enforcement officers." *Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

To be clear, none of these facts nor the inferences reasonably drawn from them establishes that Weaver was carrying a gun. But "the level of suspicion" required for reasonable suspicion is " 'considerably less than ... a preponderance' ... and 'obviously less' than is necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 397, 134 S.Ct. 1683, 188 L.Ed.2d 680 (2014) (quoting *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)). And officers " 'need not rule out the possibility of innocent conduct.' " *Id.* at 403, 134 S.Ct. 1683 (quoting *Arvizu*, 534 U.S. at 277, 122 S.Ct. 744). With the information he had in hand, it was not unreasonable for Officer Tom to formulate certain common-sense conclusions —that is, to suspect that the item Weaver was hiding might be dangerous. Weaver's actions, the majority insists, "were equally consistent

with the act of secreting drugs ....” Maj. Op. 103. But “equally consistent” and “no more suggestive” mean that Weaver was *just as likely* “secreting” a weapon or other dangerous instrument. *See* Maj. Op. 103, 104–05. And just as the reasonable suspicion standard does not require officers to rule out every *innocent* explanation for a suspect's conduct, they need not rule out every alternative *illicit* (yet non-dangerous) explanation for the conduct in which a suspect might **\*118** be engaged to conclude that he could pose a threat. *See* *Arvizu*, 534 U.S. at 277, 122 S.Ct. 744 (“A determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct.”); *Terry*, 392 U.S. at 22, 88 S.Ct. 1868 (“[Officer McFadden] had observed Terry, Chilton, and Katz, go [t]hrough a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation.”); *Santillan*, 902 F.3d at 57 n.2 (“Judge Pooler devotes considerable attention to the factor of nervousness in her dissent, and we agree that there may be innocent explanations for showing some degree of nervousness in the presence of law enforcement officers. We disagree, however, that such possible innocent explanations negate reasonable suspicion here, where nervousness is just part of the totality of circumstances that Officer Moreira was permitted to consider.”); *cf.* *United States v. Falso*, 544 F.3d 110, 128 (2d Cir. 2008) (“The fact that an innocent explanation may be consistent with the facts alleged ... does not negate probable cause.” (quoting *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985))) (Sotomayor, *J.*).

In an attempt to find support for its position, the majority misreads *United States v. Padilla*, 548 F.3d 179 (2d Cir. 2008). In *Padilla*, a detective on narcotics surveillance in a high-crime area observed two men follow a third onto an isolated dark path at around 8:15 at night rather than stay on the lighted sidewalks. *Id.* at 182. The detective suspected that a drug transaction or robbery might ensue. *Id.* at 183. Encountering the men walking together as they emerged from the wooded path some thirty seconds later, the detective observed Padilla adjust his waistband, *id.*—but engage in *no* additional conduct analogous to Weaver's highly unusual movements in the car, which the majority concedes left “no doubt that Officer Tom reasonably suspected that Weaver was hiding *something*” on his person, Maj. Op. 103–04. Nevertheless, even in *Padilla*, in which the adjustment of the waistband played a more central role in the reasonable suspicion analysis, the panel did not, contrary to the majority's claim here, base its conclusion that reasonable suspicion existed on the fact that the particular manner in which Padilla adjusted his waistband was “not consistent with any of the innocent explanations proposed by defense counsel.” 548 F.3d at 189. That fact may have strengthened the government's case, but we nevertheless reiterated in *Padilla* that “[e]ven conduct that is ‘as consistent with innocence as with guilt’ ” may give rise to the reasonable suspicion required to perform a lawful frisk. *Id.* at 187 (quoting *United States v. Villegas*, 928 F.2d 512, 516 (2d Cir. 1991)).

In short, officers are—and must be—attuned to dangers that might arise during traffic stops

so that they may act to safeguard themselves and others. *See, e.g.,* *Johnson*, 555 U.S. at 330–31, 129 S.Ct. 781; *Wilson*, 519 U.S. at 412, 117 S.Ct. 882; *Santillan*, 902 F.3d at 59. Indeed, our precedent directs us to "view the totality of the circumstances through the eyes of a reasonable *and cautious* officer on the scene." *Santillan*, 902 F.3d at 56 (emphasis added). And the Supreme Court has emphasized that we must "give due weight to inferences drawn from those facts by ... local law enforcement officers." *Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). Demanding that officers possess specific information as to dangerousness that affirmatively negates the possibility of both innocent behavior and not-dangerous-but-still-criminal activity places too great a burden on law enforcement as they process the ever-shifting circumstances around them while on patrol. *See* **\*119** *Gates*, 462 U.S. at 231, 103 S.Ct. 2317 ("The process does not deal with hard certainties, but with probabilities." (quoting *Cortez*, 449 U.S. at 418, 101 S.Ct. 690)). The possibility that Weaver might have been hiding drugs in his groin area does not negate Officer Tom's reasonable suspicion that he was in fact hiding a gun.[9] Contrary to the majority's suggestion that an officer must possess dispositive evidence of dangerousness in order to justify a stop and frisk, *see* Maj. Op. 103–04, neither *Terry* nor our cases interpreting it imposes such a requirement.

[9] Because the government does not raise the argument and because I conclude that Officer Tom had reasonable

suspicion for the frisk, I need not address whether, even if Officer Tom *lacked* reasonable suspicion for the frisk, exclusion here can bear its costs. *See* *Davis v. United States*, 564 U.S. 229, 237, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011); *Herring v. United States*, 555 U.S. 135, 141, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009). I note, however, that separate and apart from the other problems with the majority's analysis, the majority offers no basis for concluding that Officer Tom's actions were "sufficiently deliberate that exclusion [could] meaningfully deter [them], and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144, 129 S.Ct. 695.

\* \* \*

My colleagues suggest that condoning a protective frisk in the circumstances here will promote discriminatory traffic stops in other cases. But the majority concedes that the traffic stop in this case did not violate the Fourth Amendment. With respect, it is not *Terry* and its progeny, but the Supreme Court's decision in *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), that limits Fourth Amendment (but importantly not equal protection) challenges to discrimination arising from the selective enforcement of traffic laws. *Whren* explicitly concluded that "the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment," and declined to place additional Fourth Amendment constraints (beyond the

basic requirement of probable cause) on the exercise of traffic enforcement discretion. *Id.* at 813, 116 S.Ct. 1769.

Conceding that the traffic stop here did *not* violate the Fourth Amendment, the majority *sub silentio* expresses its disagreement with *Whren* in the *Terry* line of cases, and thus too quickly dismisses Officer Tom's reasonable safety concerns in light of Weaver's obviously suspicious conduct as Officer Tom approached. Again, Officer Tom could not be certain that it was a fully loaded semiautomatic handgun that Weaver was frantically attempting to "push[ ] down." App'x 158. But Officer Tom had a reasonable basis to address his "immediate interest ... in taking steps to assure himself that the person with whom he [was] dealing [was] not armed with a weapon" that might well be used against him. *Terry*, 392 U.S. at 23, 88 S.Ct. 1868. Instead of giving future Officer Toms the opportunity to take such steps, the majority adopts an unreasonable position that effectively "require[s] that police officers take unnecessary risks in the performance of their duties." *Id.*

As a parting note, the majority also urges the most "careful scrutiny of those facts offered by the police to support reasonable suspicion," suggesting that such facts should be viewed skeptically at best, particularly when "searches or seizures do result in criminal evidence." Maj. Op. 106. Here, too, the majority disregards settled precedent. The Supreme Court, in contrast, has cautioned that appellate judges in assessing reasonable

suspicion on a cold **\*120** record "should take care both to review findings of historical fact only for clear error[,] ... give due weight to inferences drawn from those facts by ... local law enforcement officers ... [and] give due weight to a trial court's finding that the officer was credible and the inference was reasonable." *Ornelas*, 517 U.S. at 699–700, 116 S.Ct. 1657. Rather than "mind[ing] ... the limitations of the judicial function in controlling the myriad daily situations in which policemen and citizens confront each other on the street" and "only judg[ing] the facts of the case before us," *Terry*, 392 U.S. at 12, 15, 88 S.Ct. 1868, the majority advocates for a less modest—and even outsized—role for appellate judges in which they construct their own understanding of the facts, unmoored from the inferences drawn by the officers on the scene and credited by the district court. One can only hope that the majority's efforts do not thereby accomplish the opposite of their lofty ambition by "discourag[ing] the employment of other remedies than the [Fourth Amendment] exclusionary rule to curtail [police] abuses" (when they do occur) "for which that sanction may prove inappropriate." *Id.* at 15, 88 S.Ct. 1868.

In sum, the majority today misapplies basic Fourth Amendment law and serves neither police, suspects, nor communities well. For the foregoing reasons, I respectfully dissent.

### All Citations

975 F.3d 94, 2020 WL 5523210

---

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

CERTIFICATE OF COMPLIANCE

Pursuant to Rule 40 of the Federal Rules of Appellate Procedure, the undersigned counsel for the United States hereby certifies that this brief complies with the type volume limitation of Rule 32(g)(1). As measured by the word-processing system used to prepare this brief, there are approximately 3,867 words in the brief.

ANTOINETTE T. BACON
*Acting United States Attorney*
 *for the Northern District of New York*

s/ *Carina H. Schoenberger*
By: CARINA H. SCHOENBERGER
*Assistant United States Attorney*

CERTIFICATE OF SERVICE
BY NEXTGEN CM/ECF

UNITED STATES OF AMERICA
v.
WEAVER

Docket No. 18-1697

The undersigned hereby certifies that she is an employee of the Office of the United States Attorney for the Northern District of New York, and is a person of such age and discretion as to be competent to serve papers.

She further certifies that on October 29, 2020, she served a copy of the appellee's Petition for Rehearing *en banc* on the United States Court of Appeals for the Second Circuit and counsel for appellant, James P. Egan, AFPD, by uploading to the Second Circuit's ECF system a Portable Document Format (PDF) version of the Brief.

s/ *Deanna Lieberman*
Deanna Lieberman

2