# 18-1697

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

CALVIN WEAVER,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

**BRIEF FOR *AMICI CURIAE*
NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS,
NEW YORK STATE ASSOCIATION OF CRIMINAL DEFENSE
LAWYERS, AND NEW YORK COUNCIL OF DEFENSE LAWYERS
IN SUPPORT OF DEFENDANT-APPELLANT**

RICHARD D. WILLSTATTER
VICE CHAIR, AMICUS CURIAE
  COMMITTEE
NATIONAL ASSOCIATION OF
  CRIMINAL DEFENSE LAWYERS
GREEN & WILLSTATTER
200 Mamaroneck Avenue, Suite 605
White Plains, New York 10601
(914) 948-5656

TIMOTHY P. MURPHY
CHAIR, AMICUS CURIAE COMMITTEE
NEW YORK STATE ASSOCIATION OF
  CRIMINAL DEFENSE LAWYERS
300 Pearl Street, Suite 200
Buffalo, New York 14202
(716) 551-3341

ALEXANDRA A.E. SHAPIRO
  *Counsel of Record*
ERIN M. JAMES
SHAPIRO ARATO BACH LLP
500 Fifth Avenue, 40th Floor
New York, New York 10110
(212) 257-4880

*Attorneys for Amici Curiae*

# TABLE OF CONTENTS

Page

STATEMENT OF INTEREST ............................................................1

SUMMARY OF ARGUMENT ..........................................................2

ARGUMENT ....................................................................................4

I.  *TERRY* FRISKS HAVE BECOME A ROUTINE AND
    ROUTINELY ABUSED POLICE TACTIC.................................4

II. CONSISTENT FEDERAL-STATE APPLICATION OF THE
    EXCLUSIONARY RULE IS THE ONLY EFFECTIVE WAY
    TO DETER LAW ENFORCEMENT FROM PERFORMING
    INTRUSIVE, HUMILIATING, AND UNCONSTITUTIONAL
    BODY FRISKS ......................................................................13

    A. Unlawful *Terry* Frisks Are Only Challenged In Criminal
       Cases Where Suppression Is Unappealing But Necessary ...................13

    B. State Courts Recognize That Suppression Is A Necessary
       And Appropriate Remedy To Deter Pretextual
       Stops and Frisks And Police Perjury .....................................15

    C. Deterrence Will Be Undermined If Federal And State
       Courts Assess *Terry* Frisks Differently And Apply The
       Exclusionary Rule Inconsistently ...........................................21

III. THIS COURT SHOULD HOLD THAT A FRISK
     COMMENCES WHEN AN INDIVIDUAL IS FORCED TO
     ASSUME AN "IN SEARCH" POSITION .................................24

CONCLUSION ..................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. Johnson*,
  555 U.S. 323 (2009) .................................................5

*Bailey v. City of Philadelphia*,
  No. 10-5952 (E.D. Pa. Apr. 20, 2020).................................6, 9

*Claflin v. Houseman*,
  93 U.S. 130 (1876) .................................................24

*Colon v. City of New York*,
  No. 09-CV-8, 2009 WL 4263362
  (E.D.N.Y. Nov. 25, 2009) ...........................................17

*Cordero v. City of New York*,
  282 F. Supp. 3d 549 (E.D.N.Y. 2017).................................17

*Davis v. United States*,
  564 U.S. 229 (2011) ................................................15

*Doornbos v. City of Chicago*,
  868 F.3d 572 (7th Cir. 2017)........................................26

*Floyd v. City of New York*,
  959 F. Supp. 2d 540 (S.D.N.Y 2013)..................................5, 7

*Massachusetts v. Sheppard*,
  468 U.S. 981 (1984) ................................................15

*Offutt v. United States*,
  348 U.S. 11 (1954) .................................................24

*People v. Anderson*,
  65 Misc. 3d 1201(A), 118 N.Y.S.3d 378
  (Sup. Ct. Queens Cty. Sept. 16, 2019) .............................19

*People v. Campbell*,
   215 A.D.2d 120 (1st Dep't 1995)..........................................................................16

*People v. Carney*,
   58 N.Y.2d 51 (1982).........................................................................................20

*People v. Castro*,
   125 Misc. 2d 15, 479 N.Y.S.2d 414
   (Sup. Ct. N.Y. Cty. 1984).................................................................................17

*People v. De Bour*,
   40 N.Y.2d 210 (1976)......................................................................................22

*People v. Driscoll*,
   101 A.D.3d 1466 (3d Dep't 2012)....................................................................21

*People v. Duran*,
   51 Misc. 3d 1220(A), 41 N.Y.S.3d 451
   (Sup. Ct. Kings Cty. 2016) ..............................................................................19

*People v. Gonzalez*,
   88 N.Y.2d 289 (1996)......................................................................................20

*People v. Gordon*,
   --- N.Y.3d ----, 2021 NY Slip Op 01093,
   2021 WL 623801 (Feb. 18, 2021) ....................................................................20

*People v. Harris*,
   --- N.Y.S.3d ---, 2020 WL 7757023
   (2d Dep't Dec. 30, 2020)..................................................................................18

*People v. Harris*,
   122 A.D.3d 942 (2d Dep't 2014)......................................................................20

*People v. Kennebrew*,
   106 A.D.3d 1107 (2d Dep't 2013).....................................................................20

*People v. Maiwandi*,
   170 A.D.3d 750 (2d Dep't 2019).......................................................................18

*People v. Nicodemus*,
  247 A.D.2d 833 (4th Dep't 1998) .......................................................20

*People v. Robbins*,
  68 Misc. 3d 1223(A), 130 N.Y.S.3d 606
  (Sup. Ct. Erie Cty. 2020) ...............................................................18

*People v. Rouse*,
  34 N.Y.3d 269 (2019)...................................................................18

*People v. Russ*,
  61 N.Y.2d 693 (1984)...................................................................20

*People v. Schuler*,
  98 A.D.3d 695 (2d Dep't 2012).........................................................21

*Terry v. Ohio*,
  392 U.S. 1 (1968) .............................................................. 4, 8, 10, 22

*Thomas v. Dillard*,
  818 F.3d 864 (9th Cir. 2016) ..................................................... 25, 27

*United States v. Curry*,
  965 F.3d 313 (4th Cir. 2020) ...........................................................10

*United States v. Hussain*,
  835 F.3d 307 (2d Cir. 2016) ............................................................15

*United States v. Leon*,
  468 U.S. 897 (1984). .....................................................................15

*United States v. Levy*,
  731 F.2d 997 (2d Cir. 1984) ............................................................26

*United States v. Mendenhall*,
  446 U.S. 544 (1980) .....................................................................26

*United States v. Weaver*,
  975 F.3d 94 (2d Cir. 2020) ....................................................... passim

*United States v. White*,
   692 F.3d 235 (2d Cir. 2012) ................................................................18


**Other Authorities**

*A Report on Arrests Arising From the New York City Police
   Department's Stop-And-Frisk Practices*, New York State
   Office of the Attorney General (November 2013),
   https://ag.ny.gov/pdfs/OAG_REPORT_ON_SQF_PRACTICES
   _NOV_2013.pdf ....................................................................... 7, 14

Abigail A. Sewell & Kevin A. Jefferson, *Collateral Damage:
   The Health Effects of Invasive Police Encounters in New York
   City,* Journal of Urban Health:  Bulletin of the New York
   Academy of Medicine, Vol. 93, Suppl 1(2016) ..................................12

Abigail A. Sewell, Kevin A. Jefferson, & Hedwig Lee, *Living
   Under Surveillance: Gender, Psychological Distress, and
   Stop-Question-And-Frisk Policing in New York City*, Social Science
   & Medicine 159 (2016) ....................................................................11

Amanda Geller, Jeffrey Fagan, & Tom R. Tyler, *Police Contact and
   Mental Health*, COLUMBIA PUBLIC LAW RESEARCH PAPER
   NO. 14-571 (2017),
   https://scholarship.law.columbia.edu/faculty_scholarship/2078 ........................11

Amanda Geller, Jeffrey Fagan, Tom R. Tyler, & Bruce G. Link,
   *Aggressive Policing and the Mental Health of Young Urban Men*,
   104 Am. J. Pub. Health 2321 (2014),
   https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4232139/pdf
   /AJPH.2014.302046.pdf ....................................................................11

George Joseph, *Staten Island Prosecutors Are Creating A List of Cops
   They Don't Trust to Testify* (Feb. 17, 2020),
   https://gothamist.com/news/ staten-island-prosecutors-are-creating-
   a-list-of-cops-they-dont-trust-to-testify................................................19

Hon. Arlander Keys, *The Third Report Assessing The Chicago Police Department's Compliance With The Investigatory Stop & Protective Pat Down Agreement* (October 17, 2019), https://www.acluil.org/sites/default/files/field_documents/ consultants_3rd_report_in_aclu_matter_10-17-19.pdf .........................................6

Ian Ayres & Jonathan Borowsky, *A Study of Racially Disparate Outcomes in the Los Angeles Police Department* (October 2008), https://www.aclusocal.org/sites/ default/ files/wpcontent/uploads /2015/09/11837125-LAPD-Racial-Profiling-Report-ACLU.pdf..........................9

Joseph Goldstein, *Why 7 Police Officers Were Blacklisted in Brooklyn,* N.Y. Times (Nov. 7, 2019), https://www.nytimes.com/ 2019/11/07/nyregion/police-credibility-brooklyn-district-attorney.html ...........................................................................19

Josephine Ross, *Warning: Stop-and-Frisk May be Hazardous to Your Health*, 25 Wm. & Mary Bill Rts. J. 689 (2016), https://scholarship.law.wm.edu/ wmborj/vol25/iss2/12.......................................12

*Racial Disparities in Stops By the D.C. Metropolitan Police Department: Review of Five Months of Data*, ACLU-DC & ACLU Analytics (June 16, 2020), https://www.acludc.org/sites/default/files/2020_06_15_aclu_stops _report_final.pdf.............................................................................................8, 9

*Report To The New York State Court's Commission On Equal Justice In The Courts*, Judicial Friends Association, Inc. (Aug. 31, 2020), https://www.nycourts.gov/LegacyPDFS/ip/ethnic-fairness/pdfs/ Judicial-Friends-Report-on-Systemic-Racism-in-the-NY-Courts.pdf................17

Rod K. Brunson, *"Police Don't Like Black People":
African-American Young Men's Accumulated Police Experiences*, 6(1) Criminology & Pub. Pol'y 71, 87 (2007) ....................................................10

*Sharad* Goel et. al, *Precinct or Prejudice? Understanding Racial Disparities in New York City's Stop-And-Frisk Policy*, 10 Annals of Applied Stat. 365 (2016) ......................................................................................8

*Stop and Frisk In Chicago*, ACLU of Ill. (March 2015),
   https://www.aclu-il.org/sites/default/files/wp-content/uploads/2015
   /03/ACLU_StopandFrisk_6.pdf ............................................................................6

*Stop-and-Frisk in the de Blasio Era,* New York Civil Liberties Union
   (March 2019), https://www.nyclu.org/sites/default/files/field_
   documents /20190314_nyclu_stopfrisk_singles.pdf .................................. 5, 7, 10

U.S. Const. amend. IV ...................................................................................4

## STATEMENT OF INTEREST

Amici curiae National Association of Criminal Defense Lawyers ("NACDL"), New York State Association of Criminal Defense Lawyers ("NYSADCL"), and New York Council of Defense Lawyers ("NYCDL") represent thousands of advocates across the United States who are committed to advancing the interests and protecting the rights of persons accused of crimes. Amici urge this Court to hold that, under the Fourth Amendment, a frisk commences when a law enforcement officer orders an individual to spread their legs, separate their hands, and assume an "in search" or "spread-eagle" position.

NACDL is a nonprofit voluntary professional bar association that works on behalf of criminal defense attorneys to ensure justice and due process for those accused of crimes or misconduct. NACDL was founded in 1958. It has a nationwide membership of many thousands of direct members, and up to 40,000 with affiliates. NACDL's members include private criminal defense lawyers, public defenders, military defense counsel, law professors, and judges. NACDL is the only nationwide professional bar association for public defenders and private criminal defense lawyers. NACDL files numerous amicus briefs each year in the U.S. Supreme Court and other federal and state courts in cases that present issues of broad importance to criminal defendants, criminal defense lawyers, and the criminal justice system as a whole.

NYSACDL is a not-for-profit corporation with a subscribed membership of more than 1,000 attorneys, including private practitioners, public defenders, and law professors, and is the largest private criminal bar in the State of New York. It is a recognized state affiliate of the NACDL and, like that organization, works on behalf of the criminal defense bar to ensure justice and due process for those accused and convicted of crimes.

NYCDL is a not-for-profit professional association of approximately 350 lawyers, including many former federal prosecutors, whose principal area of practice is the defense of criminal cases in the federal and state courts of New York. NYCDL's mission includes protecting the individual rights guaranteed by the Constitution, enhancing the quality of defense representation, taking positions on important defense issues, and promoting the proper administration of criminal justice.[1]

## SUMMARY OF ARGUMENT

Body frisks violate the Fourth Amendment unless law enforcement officers have reason to suspect they are dealing with an armed and dangerous person. Yet study after study shows that only a tiny fraction of police frisks result in the recovery of a weapon, and that the overwhelming majority of people frisked by the

---

[1] No party or its counsel authored this brief in whole or part or contributed money to fund its preparation or submission. This brief is submitted pursuant to the invitation of the Court in its *en banc* order of January 6, 2021.

police are innocent of any wrongdoing whatsoever.   Moreover, it is well-documented that communities of color bear the brunt of illegal police behavior because the police disproportionately target Blacks and Latinos when conducting frisks.  To deter illegal police misconduct and protect individuals from intrusive, dehumanizing, and unconstitutional frisks, it is imperative that federal courts vigorously enforce the Fourth Amendment.  Qualified immunity deprives wrongfully-frisked people of any real remedy against such misconduct, so the only practical means of deterring the police is consistent enforcement of the exclusionary rule.

As reflected both in reported case law and in the experience of amici's members, state courts, which see many more motions relating to stop and frisks, frequently recognize that police officers commit perjury to justify unconstitutional frisks in the rare instances in which they recover contraband.  Accordingly, state courts tend to suppress evidence more frequently than federal courts.  Adopting a more permissive standard in which demanding that a person exit a vehicle and assume a "spread-eagle" position against the car is not treated as a search would invite more unconstitutional frisks, and would enlarge the gap between state and federal enforcement of the Fourth Amendment.  Indeed, in this very case, a state court suppressed the evidence recovered during the frisk of Calvin Weaver, only to

have its decision effectively nullified when the government re-prosecuted Mr.

Weaver in a federal district court that upheld the frisk.

A command to assume an "in search" position is self-evidently a significant

deprivation of liberty that should not be permitted absent reasonable suspicion that

a person is armed and dangerous. The government's position on when a frisk

occurs deprives the Fourth Amendment's prohibition on unreasonable searches of

any real meaning. It would send the police a dangerous message—that they can

frisk first and justify the frisk after the fact, in the unlikely event that the person

frisked actually has contraband. Accordingly, this Court should enforce *Terry* and

hold that ordering a person to assume a "in search" or "spread-eagle" position

requires reasonable suspicion that the person is armed and dangerous.

## ARGUMENT

## I. *TERRY* FRISKS HAVE BECOME A ROUTINE AND ROUTINELY ABUSED POLICE TACTIC

The Fourth Amendment protects individuals against "unreasonable searches

and seizures" by law enforcement, including unjustified body frisks or pat-downs.

U.S. Const. amend. IV; *Terry v. Ohio*, 392 U.S. 1, 16 (1968). It is well-settled that

"careful exploration of the outer surfaces of a person's clothing all over his or her

body in an attempt to find weapons" is a "search" within the meaning of the Fourth

Amendment. *Terry*, 392 U.S. at 16. Police-conducted body frisks "may inflict

great indignity and arouse strong resentment." *Id.* at 17. Accordingly, absent

4

probable cause, frisks are unconstitutional unless a police officer has a "reason to believe that he is dealing with an armed and dangerous individual." *Id.* at 27; *see also Arizona v. Johnson*, 555 U.S. 323, 326-27 (2009) ("[T]o proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous.").

    Although the authority to conduct body frisks was "narrowly drawn" in the Supreme Court's landmark *Terry* ruling, frisking has become a routine police practice during investigatory stops. In 2013, for instance, the City of New York acknowledged that 52% of the 4.4 million NYPD stops between January 2004 and June 2012 were followed by a protective frisk for weapons. *Floyd v. City of New York*, 959 F. Supp. 2d 540, 558 (S.D.N.Y 2013). Use of the practice has *increased* since that time, to over 66% of all reported stops between 2014 and 2017. *Stop-and-Frisk in the de Blasio Era,* New York Civil Liberties Union (March 2019) ("NYCLU Report") at 14.[2]

These are alarming statistics, and this frisk-first practice is by no means limited to New York City. Data from other big cities demonstrates that frisks are habitually performed with or without reasonable suspicion of dangerousness, even though *Terry* and its progeny unequivocally hold that frisks are legal only where

---

[2] Available at: https:// www.nyclu.org/sites/default/files/field_documents/ 20190314_nyclu_stopfrisk_singles.pdf.

there is reason to suspect that a person is "armed and dangerous." A 2019 report assessing the Chicago Police Department's compliance with its Investigatory Stop and Protective Pat Down Settlement Agreement found that city officers were still commonly frisking people in situations that did not appear to present "risks of harm to the officer or someone else." Hon. Arlander Keys, *The Third Report Assessing The Chicago Police Department's Compliance With The Investigatory Stop & Protective Pat Down Agreement* (October 17, 2019) at 15.[3] Similarly, a report about the Philadelphia Police Department's compliance with its own stop-and-frisk consent decree found that between 30-53% of Philadelphia Police Department frisks between 2012 and 2019 were undertaken illegally. *See* Plaintiff's Tenth Report To Court On Stop And Frisk Practices: Fourth Amendment Issues, *Bailey v. City of Philadelphia*, No. 10-5952 (E.D. Pa. Apr. 20, 2020), Dkt. 104 ("Philadelphia Tenth Report") at 1-6.

---

[3] Available at: https://www.acluil.org/sites/default/files/field_documents/ consultants_3rd_report_in_aclu_matter_10-17-19.pdf. The Agreement was entered after the American Civil Liberties Union exposed the Chicago Police Department's systematic abuse of the stop-and-frisk practice. Among other things, the ACLU report found that (1) black Chicagoans were subjected to 72% of all stops (even though they constituted just 32% of the city's population; (2) during one Chicago summer more than 250,000 stops did not lead to an arrest; (3) a significant number of the Chicago Police Department's stops were not supported by reasonable suspicion; and (4) Chicago police did not keep data on frisks. *See Stop and Frisk In Chicago*, ACLU of Ill. (March 2015), available at: https:// www.aclu-il.org/sites/default/files/wp-content/uploads/2015/03/ACLU_ StopandFrisk_6.pdf

The liberal use of frisks is often rationalized—by courts and police officers—as necessary to officer safety. However, the empirical data refute this argument and suggest that *Terry* frisks are exceedingly *unlikely* to lead to the discovery of any weapon, and even less likely to turn up a gun.

In New York, for example, weapons were recovered in only 1.5% of the 2.3 million NYPD frisks conducted between January 2004 and June 2012. *See Floyd*, 959 F. Supp. 2d at 558 ("In other words, in 98.5% of the 2.3 million frisks, no weapon was found."). Between 2009 and 2012, this resulted in just 0.1% of all stops leading to a conviction for possession of a weapon—a number that includes convictions for the possession of "common small knives, such as gravity knives." *A Report on Arrests Arising From the New York City Police Department's Stop-And-Frisk Practices*, New York State Office of the Attorney General (November 2013) ("NYC Stop-And-Frisk Arrest Report") at 3.[4] The New York City gun-recovery rate from frisks was even lower (about 1%) between 2014 and 2017. *See* NYCLU Report at 18. More recent data indicate that this trend continues. For instance, Philadelphia reported a positive gun hit-rate of only 1.5% of frisks for the second half of 2019. *See* Philadelphia Tenth Report at 11. And Washington D.C. reported that only 0.8% of reported stops led to the seizure of a weapon of any kind

---

[4] Available at: https://ag.ny.gov/pdfs/OAG_REPORT_ON_SQF_PRACTICES_ NOV_2013.pdf.

and only 0.6% led to the recovery of a firearm.  *See Racial Disparities in Stops By the D.C. Metropolitan Police Department: Review of Five Months of Data*, ACLU-DC & ACLU Analytics (June 16, 2020) ("D.C. Report") at 1, 8.[5]

The incredibly low hit-rates associated with *Terry* frisks strongly suggests that either (1) officers routinely conduct frisks without a reasonable basis to suspect that the stopped individual is armed and dangerous or (2) officers are simply wrong *far* more often than they are right when assessing dangerousness (which itself reduces the reasonableness of the officers' reliance on their own suspicions, judgment, and experience).  Either way, the unfortunate and indisputable result is that every year *hundreds of thousands* of people are subjected to an unjustified public shaming involving the intrusive and unwelcome touch of a complete stranger across the most intimate areas of their bodies.  As the Supreme Court has emphasized, body frisks are seriously intrusive; they involve an officer "feel[ing] with sensitive fingers every portion of the [person's] body," including a "thorough search of the…arms and armpits, waistline and back, the groin and area

---

[5] Available at: https://www.acludc.org/sites/default/files/2020_06_15_ aclu_stops_report_final.pdf.  *See also Sharad* Goel et. al, *Precinct or Prejudice? Understanding Racial Disparities in New York City's Stop-And-Frisk Policy*, 10 Annals of Applied Stat. 365 (2016), at 366-67 (concluding that in 43% of the ~300,000 NYPD stops based on suspicion of criminal possession of a weapon conducted between 2011 and 2012, there was at most a 1% chance of finding a weapon on the suspect and that only about 10% of all weapons found were guns).

8

about the testicles, and entire surface of the legs down to the feet." *Terry*, 392 U.S. at 17 & n.13.

The vast majority of the victims of these Fourth Amendment violations are persons of color—who are stopped and frisked at alarmingly disproportionate rates. A study of pedestrian and motor vehicle stops by the Los Angeles Police Department over a one-year period found that Blacks were stopped almost 260% more often than Whites, and that stopped Blacks were 127% more likely to be frisked than stopped Whites. *See* Ian Ayres & Jonathan Borowsky, *A Study of Racially Disparate Outcomes in the Los Angeles Police Department* (October 2008) at 5-6.[6] Similar findings have been reported in many other U.S. cities. For instance, in Philadelphia in 2019—nearly a decade after the city entered a stop-and-frisk consent decree—Blacks and Latinos still accounted for 88% of all frisks, with 1 in 7.2 stops of Black pedestrians resulting in a frisk.[7] In Washington D.C. in 2019, Black people made up over 90% of those who experienced a search or pat down of their person or property, and were more than six times more likely to be frisked than White people.[8] And in New York between 2014 and 2017, 84% of all

---

[6] Available at: https://www.aclusocal.org/sites/ default/ files/wpcontent/ uploads/2015/09/11837125-LAPD-Racial-Profiling-Report-ACLU.pdf.

[7] Plaintiffs' Tenth Report To Court On Stop And Frisk Practices: Fourteenth Amendment Issues, *Bailey v. City of Philadelphia*, No. 10-5952 (E.D. Pa. Apr. 20, 2020), Dkt. 106, at 4.

[8] D.C. Report at 6.

frisks occurred during stops of Black and Latino people whereas only 9% occurred during stops of White people.[9]

As the Supreme Court has recognized, the experience of any frisk—but particularly an unjustified one—is far from a "petty indignity." *Terry*, 392 U.S. at 17. It is a "serious intrusion on the sanctity of the person," *id.*, and one that can leave both visible and invisible scars. Frisks often escalate to the use of force by the police. *See* NYCLU Report at 20 (NYPD used force in 28% of all *Terry* stops between 2014 and 2017). Persons of color are more likely to suffer the use of physical violence at the scene of the frisk. In New York, for example, 21,776 Black and Latino people had force used against them during stops between 2014 and 2017, while only 2,293 White people did. *Id.* at 23. "Common" forms of violence reported by young Black males during stop-and-frisks include "pushing, shoving, punching, kicking, and the use of mace" by police officers. Rod K. Brunson, *"Police Don't Like Black People": African-American Young Men's Accumulated Police Experiences*, 6(1) Criminology & Pub. Pol'y 71, 87 (2007); *see also United States v. Curry*, 965 F.3d 313, 332 (4th Cir. 2020) (en banc) (Gregory, J., concurring) (lamenting the "long history of black and brown communities feeling unsafe in police presence").[10]

---

[9] NYCLU Report at 17.

[10] Disturbingly, this study also found that "being innocent could increase young men's chances of being assaulted, as they were more likely to challenge the

Individuals often sustain psychological trauma from frisks. Research has shown that individuals subjected to body frisks, particularly those subjected to multiple frisks, "report, on average, multiple PTSD symptoms." Amanda Geller, Jeffrey Fagan, & Tom R. Tyler, *Police Contact and Mental Health*, COLUMBIA PUBLIC LAW RESEARCH PAPER NO. 14-571 (2017) at 28.[11] Young men who have had "intrusive" contact with law enforcement also often experience higher levels of anxiety, trauma, nervousness, worthlessness, and more severe psychological distress. *See* Amanda Geller, Jeffrey Fagan, Tom R. Tyler, & Bruce G. Link, *Aggressive Policing and the Mental Health of Young Urban Men*, 104 Am. J. Pub. Health 2321, 2324-25 (2014)[12]; Abigail A. Sewell, Kevin A. Jefferson, & Hedwig Lee, *Living Under Surveillance: Gender, Psychological Distress, and Stop-Question-And-Frisk Policing in New York City*, Social Science & Medicine 159 (2016), at 9.

Researchers have also found that the mere prevalence of frisking in a given neighborhood can negatively affect overall community health. For example, "[i]n areas where pedestrian stops are more likely to culminate in frisking, the

---

inappropriateness of officers' actions when they were not engaged in unlawful acts." *Id.* at 95-96.

[11] Available at: https://scholarship.law.columbia.edu/faculty_scholarship/2078.

[12] Available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4232139/pdf /AJPH.2014.302046.pdf.

11

prevalence of poor/fair health, diabetes, high blood pressure, past year asthma episodes, and heavier body weights is higher." Abigail A. Sewell & Kevin A. Jefferson, *Collateral Damage: The Health Effects of Invasive Police Encounters in New York City,* Journal of Urban Health: Bulletin of the New York Academy of Medicine, Vol. 93, Suppl 1(2016), at S54 . Living in high-risk frisking neighborhoods is also associated "with experiencing more severe psychological distress for all residents." Sewell, Jefferson, & Lee, *supra* at 11, at 9.

Moreover, the liberal use of body frisks as a police tactic has greatly contributed to the deteriorating relationships between police and communities of color. "Men living in highly policed neighborhoods, especially men of color, indicate high levels of worry and anticipation caused by the possibility of being stopped by the police at any time, as well as anger, frustration, and resentment caused by the perception that police unfairly target them." *Id*. at 2. The unchecked use of the practice has also frayed the general public's trust in the criminal justice system. *See* Josephine Ross, *Warning: Stop-and-Frisk May be Hazardous to Your Health*, 25 Wm. & Mary Bill Rts. J. 689, 722-25 (2016) (collecting studies discussing trust issues stemming from stop-and-frisk policies).[13] This distrust, in turn, heightens officers' suspicions and fears when interacting with the public,

---

[13] Available at: https://s cholarship.law.wm.edu/ wmborj/vol25/iss2/12.

making it more likely that they will conduct "protective" frisks during

investigatory stops.  And so the cycle continues.

## II.  CONSISTENT FEDERAL-STATE APPLICATION OF THE EXCLUSIONARY RULE IS THE ONLY EFFECTIVE WAY TO DETER LAW ENFORCEMENT FROM PERFORMING INTRUSIVE, HUMILIATING, AND UNCONSTITUTIONAL BODY FRISKS

### A. Unlawful *Terry* Frisks Are Only Challenged In Criminal Cases Where Suppression Is Unappealing But Necessary

Even though the data show that American police officers engage in

unconstitutional body frisks on a daily basis, there is virtually no legal recourse for

those subjected to such frisks.  That is because qualified immunity shields law

enforcement from personal civil liability for their on-the-job conduct in almost all

circumstances.  As Judge Calabresi explained in his opinion concurring in the

panel decision, cases involving unjustified police conduct are rarely presented to

courts because (1) people subjected to illegal searches "may well not know that

they can bring a lawsuit, or . . . may be too disaffected to sue" or (2) lawyers may

correctly advise them that recovery for the injustice is exceedingly unlikely due to

the qualified immunity doctrine.  *United States v. Weaver*, 975 F.3d 94, 109 (2d

Cir. 2020) (Calabresi, J., concurring).

Because there is no realistic possibility for civil liability for unlawful frisks,

most *Terry* challenges arise in criminal cases.  Thus, judges tend to review only the

statistically rare situations in which officers conducting an allegedly protective

frisk actually recovered contraband.  Federal judges see a particularly small subset of these cases, since most involve minor drug infractions, petty weapon possession, or other conduct falling outside the bounds of federal law.  Indeed, one study of New York City stop-and-frisk arrests between 2009 and 2012 found that upwards of 40% of convictions flowing from *Terry* stop-and-frisks were for "relatively minor" "quality-of-life offenses" (like graffiti and disorderly conduct) and more than another third of convictions were for drug, trespass, and property crimes. NYC Stop-And-Frisk Arrest Report at 3.

The exceedingly small percentage of *Terry*-frisk cases reaching federal jurisdiction means federal judges are presented with a skewed picture.  That is, federal courts are repeatedly confronted with "exceptions" (the rare situations in which a frisked person had a gun) but likely to see them as the rule.  This is compounded by the self-validating nature of fruitful frisks—a gun was recovered, making it tempting to conclude that the officer had reason to suspect the person was armed and dangerous.  Suppression in such circumstances is plainly an unappealing outcome.  Indeed, this Court has observed that it is difficult to objectively assess appeals "based on the Fourth Amendment from denied motions to suppress evidence of illegal weapons or contraband (drugs, etc.)…because the Government is in a sense proven right. Whatever prompted the search (a hunch, suspicion, luck, reasonable belief, or probable cause), incriminating evidence was

14

found." *United States v. Hussain*, 835 F.3d 307, 309 (2d Cir. 2016); *see also Weaver*, 975 F.3d at 108-09 (Calabresi, J., concurring) (recognizing that courts are "driven by the desire to avoid excluding determinative evidence" and, thus, frequently refuse to invalidate a search because "the defendant seeking exclusion *is almost always guilty of something* and might be dangerous").

But the fact is that the exclusionary rule remains the most powerful means— indeed, the only viable means—of deterring police officers from conducting unlawful frisks. That is the entire point of the exclusionary rule. *See Davis v. United States*, 564 U.S. 229, 246 (2011) ("[W]e have said time and again that the *sole* purpose of the exclusionary rule is to deter misconduct by law enforcement."); *Massachusetts v. Sheppard*, 468 U.S. 981, 990 (1984) ("The exclusionary rule was adopted to deter unlawful searches by police."). In order to be an effective deterrent, however, the rule must be enforced with sufficient frequency and strength to actually "alter the behavior of individual law enforcement officers or the policies of their departments." *United States v. Leon*, 468 U.S. 897, 918 (1984).

## B. State Courts Recognize That Suppression Is A Necessary And Appropriate Remedy To Deter Pretextual Stops and Frisks And Police Perjury

Amici's members have litigated thousands of suppression motions by criminal defendants arrested following *Terry* stops and frisks, in trial and appellate

courts in New York State and the federal system. Amici curiae NACDL, NYSADCL, and NYCDL represent every facet of the criminal defense bar. Members of their organizations include public defenders, private criminal defense lawyers, active U.S. military defense counsel, law professors, and former and present judges. Their collective experience litigating criminal cases is extensive. In their considerable experience, NACDL, NYSADCL, and NYCDL members have found that state courts are far more likely to suppress evidence seized from such frisks than are federal courts. Two factors account for this.

*First*, state court judges have far more experience assessing testimony by local police officers. As a result, they are generally more objective about officers' testimony and less likely to defer to an officer's account of the circumstances leading up to—and the events occurring during—a *Terry* stop and frisk. Indeed, New York courts have long recognized police perjury as a significant issue within the NYPD, acknowledging that, in some precincts, it is "so common" that "it has spawned its own word: 'testilying.'" *People v. Campbell*, 215 A.D.2d 120, 131 n.11 (1st Dep't 1995). The problem is that it is not uncommon for the police to manufacture reasonable suspicion post hoc in order to justify a frisk that was ex ante unreasonable but happened to result in the seizure of a weapon. One court noted, for instance, "an alarming trend not only in [police] testimony 'patently tailored to nullify constitutional objections,' but in an apparently

16

routine police procedure which threatens the constitutionally protected civil liberties of our citizens." *People v. Castro*, 125 Misc. 2d 15, 15, 479 N.Y.S.2d 414, 415 (Sup. Ct. N.Y. Cty. 1984).[14]  Presumably to curb the prevalence of "testilying" (a.k.a perjury), the New York State Court system recently announced a New York Suppression Decision Pilot Program, which requires the courts to "provide information on cases in which either evidence was suppressed or there was a finding of a lack of credibility of a police officer during a suppression hearing." *Report To The New York State Court's Commission On Equal Justice In The Courts*, Judicial Friends Association, Inc. (Aug. 31, 2020), at 31.[15]  And the New York Court of Appeals has expressly held that "[l]aw enforcement witnesses should be treated in the same manner as any other witnesses for purposes of cross-examination" and can be cross-examined about "a prior judicial determination that

---

[14] New York federal courts have begun to recognize this problem.  *See, e.g.*, *Cordero v. City of New York*, 282 F. Supp. 3d 549, 554 (E.D.N.Y. 2017) (noting that jurors "are ever more aware of stories in the media reporting police officers lying to justify false arrests and to convict criminal defendants," and acknowledging that "some experts on police practice treat lying by police at trials and in their paperwork as the 'norm,' 'commonplace,' or 'routine'"); *Colon v. City of New York*, No. 09-CV-8, 2009 WL 4263362, at *2 (E.D.N.Y. Nov. 25, 2009) ("Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department.").

[15] Available at https://www.nycourts.gov/LegacyPDFS/ip/ethnic-fairness/pdfs/Judicial-Friends-Report-on-Systemic-Racism-in-the-NY-Courts.pdf.

a police officer's testimony was unworthy of belief" (subject to the discretionary determination of the trial court that its probativeness outweighs its prejudicial effect). *People v. Rouse*, 34 N.Y.3d 269, 276, 280 (2019).[16]

Because they recognize that police perjury is so common, New York State judges do not hesitate to reject questionable law enforcement testimony at suppression hearings if they believe the officer(s) may be making false statements to justify otherwise illegal stops, frisks, and searches. Just two months ago, New York's Second Department held that the trial court incorrectly assessed the evidence at a suppression hearing by crediting the testimony of the prosecution's two police witnesses. On appeal, the Second Department refused to credit the officers' testimony because their "versions of the incident conflicted with each other and could not both be simultaneously true" and, even viewed in isolation, their testimony was 'implausible and contrived.'" *People v. Harris*, ---N.Y.S.3d---, 2020 WL 7757023, at *8 (2d Dep't Dec. 30, 2020).

That ruling was not an outlier—police witnesses have been discredited with increasing frequency in New York's state courts. *See, e.g.*, *People v. Maiwandi*, 170 A.D.3d 750, 751 (2d Dep't 2019) (officer testimony supporting search "strain[ed] credulity and defie[d] common sense"); *People v. Robbins*, 68 Misc. 3d

---

[16] The Court of Appeals elected not to adopt the more restrictive 7-factor test in this Court's decision in *United States v. White*, 692 F.3d 235 (2d Cir. 2012). *See Rouse*, 34 N.Y.3d at 279-80.

1223(A), 130 N.Y.S.3d 606, at *3 (Sup. Ct. Erie Cty. 2020) ("arresting officers'
testimony did not strike this Court as credible"); *People v. Anderson*, 65 Misc. 3d
1201(A), 118 N.Y.S.3d 378, at *5 (Sup. Ct. Queens Cty. Sept. 16, 2019) (officer's
testimony regarding his alleged observation of 12 marijuana crumbs near the
driver's feet strained credulity, was contrary to common experience, and appeared
to be tailored); *People v. Duran*, 51 Misc. 3d 1220(A), 41 N.Y.S.3d 451, at *8
(Sup. Ct. Kings Cty. 2016) (officer's testimony was "incredible and
unbelievable").[17]

*Second*, in Amici's members' experience, state courts tend to be somewhat
desensitized to the "self-validating" nature of fruitful *Terry* frisks and, as a result,
are generally more willing to exercise their suppression powers than the federal
courts.  New York courts regularly grant motions to suppress physical evidence,
even in cases involving serious crimes where the evidence to be suppressed firmly
proves the guilt of the accused.  Murder weapons, loaded guns, drugs and drug
paraphernalia, and moneybags have all been suppressed.  *See, e.g.*, *People v.*

---

[17] The issue of police perjury has only intensified in recent years, leading several
state prosecutors' offices to create formal police witness exclusion lists. *See*
George Joseph, *Staten Island Prosecutors Are Creating A List of Cops They Don't
Trust to Testify* (Feb. 17, 2020), https://gothamist.com/news/ staten-island-
prosecutors-are-creating-a-list-of-cops-they-dont-trust-to-testify; Joseph Goldstein,
*Why 7 Police Officers Were Blacklisted in Brooklyn,* N.Y. Times (Nov. 7, 2019),
https:// www.nytimes.com/ 2019/11/07/nyregion/police-credibility-brooklyn-
district-attorney.html.

*Gordon*, --- N.Y.3d ----, 2021 NY Slip Op 01093, 2021 WL 623801, at *1 (Feb. 18, 2021); *People v. Gonzalez*, 88 N.Y.2d 289, 297 (1996); *People v. Nicodemus*, 247 A.D.2d 833, 836 (4th Dep't 1998).

New York courts also do not hesitate to suppress evidence recovered during suspicionless *Terry* frisks. The New York Court of Appeals has at least twice reversed decisions that did not suppress evidence recovered during frisks lacking the requisite suspicion of dangerousness. *See People v. Russ*, 61 N.Y.2d 693, 694-95 (1984) (pistol should have been suppressed where there was no predicate for suspecting dangerousness in the information law enforcement received about the defendant prior to the stop or in what occurred during the officer's encounter with her); *People v. Carney*, 58 N.Y.2d 51, 54-55 (1982) (handgun seized during frisk based on civilian tip that defendant looked "suspicious" should have been suppressed).

New York's lower courts have followed that lead, suppressing knives, drugs, and guns obtained during frisks where there was no reasonable basis to suspect any danger to the officers. *See, e.g., People v. Harris*, 122 A.D.3d 942, 944-45 (2d Dep't 2014) (gun should have been suppressed where, at most, police suspected defendant of being involved in "a burglary" and defendant did not reach for bulge in his pocket or make any other "threatening or menacing gesture"); *People v. Kennebrew*, 106 A.D.3d 1107, 1109 (2d Dep't 2013) (affirming suppression of

handgun because an "unidentifiable bulge which is readily susceptible of an innocent as well as a guilty explanation is not sufficient to justify a pat-down search"); *People v. Schuler*, 98 A.D.3d 695, 695-97 (2d Dep't 2012) (bag of cocaine discovered during frisk should have been suppressed where police believed defendant "may have intended to flee" but "defendant gave no indication that he intended to harm the officer"); *People v. Driscoll*, 101 A.D.3d 1466, 1467 (3d Dep't 2012) (bag of cocaine recovered during pat frisk based primarily on defendants' parole status and refusal to exit vehicle should have been suppressed by trial court).

### C. Deterrence Will Be Undermined If Federal And State Courts Assess *Terry* Frisks Differently And Apply The Exclusionary Rule Inconsistently

The procedural history of this case underscores the importance of consistent application of the exclusionary rule between the state and federal courts and demonstrates why vigorously enforcing the exclusionary rule is imperative to ensure that equal justice is meted out irrespective of whether one is prosecuted in federal or state court. Examining the exact same facts and applying the same legal standard, the Onondoga County Court and the United States District Court for the Northern District of New York came to opposite conclusions about whether the

Syracuse Police Department's frisk of Calvin Weaver was supported by reasonable suspicion.[18]

Weaver was initially charged in Onondaga County with criminal possession of a weapon in the second degree.  He moved to suppress the firearm recovered from his person, arguing that it was seized during an unlawful frisk after an illegal traffic stop.  After conducting an evidentiary hearing, the County Court held that the frisk was unjustified, because there was no evidence that the Syracuse police officers "reasonably suspected that they were in danger of physical injury" before they conducted the frisk.  *En Banc* Appendix at A.26.  In so holding, the Court noted that at all times before the frisk, Weaver cooperated with the officers' directives (including an instruction to place his hands on his head).  *Id.* at A.25-26.  The Court also highlighted that "no officer testified that he observed the outline of a gun, a noise consistent with the magazine of a weapon, or a waistband bulge."  *Id.*  The Court thus suppressed all tangible physical property recovered from Weaver's person during the frisk.  *Id.* at A.27.

---

[18] Both New York law and federal constitutional law assess the validity of a frisk by analyzing whether an officer reasonably suspects that an individual is armed. *Compare Terry*, 392 U.S. at 27 (reasonable search for weapons "for the protection of the police officer" is permissible where the officer "has reason to believe that he is dealing with an armed and dangerous individual"), *with People v. De Bour*, 40 N.Y.2d 210, 223 (1976) (authority for frisk exists "if the officer reasonably suspects that he is in danger of physical injury by virtue of the detainee being armed").

Two months after the County Court suppressed Weaver's gun, Weaver was prosecuted federally for possession of a firearm by a felon, possession of a firearm with a removed serial number, and simple possession of a controlled substance. *Id.* at A.10-11.  Once again, he moved to suppress the physical evidence as fruits of an illegal stop and frisk. *Id.* at A.12-18.  This time, however, the motion was denied. The district court here found reasonable suspicion supported the frisk because (1) the officers observed Weaver watching their vehicle in a high-crime area; (2) the officers observed Weaver pull up his pants while walking; (3) one officer saw Weaver pushing in a downward motion on his pelvic area with both hands while seated in a vehicle; (4) Weaver told an officer that he didn't "got nothing"; and (5) when the frisk began, Weaver pressed his pelvis against the vehicle multiple times. *Id.* at  A.218.  A panel of this Court reversed the district court's order in September 2020, bringing the state and federal suppression decisions into harmony. *See Weaver*, 975 F.3d at 102-07.  But now, once again, Weaver faces the threat of a federal rehearing.

If the *en banc* Court affirms the district court, the result will be two diametrically opposed rulings based on the same set of facts and the same law. Weaver will have been told by a state court (and at least two federal appellate judges) that he was unconstitutionally frisked and then told by another group of federal judges that the frisk was perfectly justified.  Such divergent rulings would

23

undercut the long-settled notion that states are fully competent to apply constitutional law, *see Claflin v. Houseman*, 93 U.S. 130, 136-37 (1876), and undermine the deterrent effect on police misconduct of state courts' suppression. The message to law enforcement will be:  Don't worry about complying with the Fourth Amendment, because in the 1% of frisks in which you recover a weapon, you can always take your case across the street to federal court even if the state judge suppresses the weapon.

Such irreconcilable state and federal rulings would severely undermine not only Weaver's faith in the justice system but the public's as well.  Justice must at least "satisfy the appearance of justice."  *Offutt v. United* States, 348 U.S. 11, 14 (1954).  Neither justice nor the appearance of justice will be served if the district court's order denying suppression is affirmed.

## III.   THIS COURT SHOULD HOLD THAT A FRISK COMMENCES WHEN AN INDIVIDUAL IS FORCED TO ASSUME AN "IN SEARCH" POSITION

Robust enforcement of the exclusionary rule in this context is necessary not only because it is the only way to deter unconstitutional frisks, but also because a more permissive standard would conflict with the controlling law.  The original *Weaver* panel correctly held that a frisk commences (at the latest) when an individual is ordered to assume an "in search," spread-eagle position.  *Weaver*, 975

24

F.3d at 101-02.  The full Court should reaffirm that ruling and reverse the district court.  *See* Weaver *En Banc* Brief*,* Dkt. 109 at 25-44.[19]

Moreover, the position Chief Judge Livingston urged in her dissent would create incentives for police officers to concoct baseless rationales for a frisk during the indefinite "in between" time between the order and the actual pat-down.  During those tense moments—or minutes—an individual could engage in any number of actions that an officer could pretextually use to justify a frisk:  he or she could tumble out of the search position, surprising the officers; or quickly move to scratch an itch; or even just express frustration while being forced to sustain a humiliating, awkward, and tiresome position for a long period of time.  *See Thomas v. Dillard*, 818 F.3d 864, 885 (9th Cir. 2016) (a "reactive, instinctive movement" made "in response to an officer's own aggressive movement" while putting individual into a "controlled hold" cannot give rise to reasonable suspicion of dangerousness).

Indeed, that is exactly what happened to Weaver.  After voluntarily providing a Syracuse Police officer with identification and complying with an

---

[19] A contrary ruling would create a circuit split.  The Ninth Circuit has held that police officers must have a reasonable basis for believing an individual might be armed and dangerous when they demand submission to a weapon search and that, without it, a "constitutional violation" is complete once a "detention for the purpose of a weapons frisk" is initiated.  *Thomas v. Dillard*, 818 F.3d 864, 875 (9th Cir. 2016).

25

instruction to show the officer his hands, Weaver was ordered out of the passenger seat of a car and instructed to "place his hands on the trunk with his legs spread apart." *Weaver*, 975 F.3d at 98. Weaver complied with this order but positioned himself "very close to the rear quarter panel of the vehicle." *Id.* He was then ordered to "take a step back," which he did. *Id.* At the suppression hearing, the officer relied on the fact that Weaver took "only a very 'small step back'" in response to that order to support the reasonableness of the frisk, even though he clearly had already made the decision to frisk Weaver by that point. *Id.* at 113-14 (Livingston, dissenting).

Any reasonable, law-abiding person would believe that a frisk had been initiated if he or she was ordered to assume an "in search" position. A Fourth Amendment seizure occurs when officers use "language or a tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).[20] As the Seventh Circuit has noted: "[A]n officer can initiate a frisk *before* physically touching a person…such as when an officer makes certain displays of force like pointing a weapon or using language or a tone of voice that indicates compliance is mandatory." *Doornbos v.*

---

[20] Indeed, this Court has held that ordering a defendant to "freeze" and forcing him to stand spread-eagled against a wall is an "arrest" because he was restrained and his freedom of movement was restricted, even though he had yet to be taken into custody. *United States v. Levy*, 731 F.2d 997, 1000 (2d Cir. 1984).

*City of Chicago*, 868 F.3d 572, 581 (7th Cir. 2017) (emphasis added); *see also*

*Thomas*, 818 F.3d at 875  (frisk occurs once "detention" for the purpose of

carrying out frisk is initiated).  Accordingly, that is when officers must have a

reasonable suspicion of dangerousness to support a frisk.

## CONCLUSION

For the foregoing reasons, this Court should hold that a frisk commences

when an individual is ordered to assume an "in search" position.

Dated: March 8, 2021

Respectfully submitted,

/s/ Alexandra A.E. Shapiro

| | |
|---|---|
| Richard D. Willstatter | Alexandra A.E. Shapiro |
| Vice Chair, Amicus Curiae | Erin M. James |
| Committee | SHAPIRO ARATO BACH LLP |
| NATIONAL ASSOCIATION OF | 500 Fifth Avenue, 40th Floor |
| CRIMINAL DEFENSE LAWYERS | New York, New York 10110 |
| GREEN & WILLSTATTER | Tel: (212) 257-4881 |
| 200 Mamaroneck Avenue, Suite 605 | Fax: (212) 202-6417 |
| White Plains, New York 10601 | |
| Tel: (914) 948-5656 | |

Timothy P. Murphy
Chair, Amicus Curiae Committee
NEW YORK STAE ASSOCIATION OF
CRIMINAL DEFENSE LAWYERS
300 Pearl Street, Suite 200
Buffalo, New York 14202
Tel: (706) 551-3341

*Attorneys for Amici Curiae*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND <u>TYPE STYLE REQUIREMENTS</u>

1.      Pursuant to Rules 29(a)(5) and 32(a)(7) of the Federal Rules of Appellate Procedure and Local Rules 29.1(c) and 32.1(a)(4), I certify that, according to the word-count feature of the word processing program, this brief contains 6,284 words, including headings, footnotes and quotations, but excluding the parts exempted by Fed. R. App. P. 32(f), and therefore is in compliance with the type-volume limitations set forth in Rule 32(a)(7)(B).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font of Times New Roman.

Dated:  New York, New York
       March 8, 2021

                      <u>/s/ Alexandra A.E. Shapiro</u>
                      Alexandra A.E. Shapiro